Appeal No. 2016-2303

# *UNITED STATES COURT OF APPEALS*

## *for the*

## *FEDERAL CIRCUIT*

IN RE:  SMITH INTERNATIONAL, INC.,

*Appellant.*

---

APPEAL FROM THE UNITED STATES PATENT AND
TRADEMARK OFFICE – PATENT TRIAL AND APPEAL BOARD
in REEXAMINATION NO. 90/012,912

---

**CORRECTED BRIEF FOR
SMITH INTERNATIONAL, INC.**

———————

*Of Counsel:*

RICHARD L. STANLEY
P.O. Box 7967
Houston, Texas  77270
(832) 656-4277

JOHN R. KEVILLE
*Attorney of Record*

TYLER T. VANHOUTAN
WINSTON & STRAWN LLP
1111 Louisiana Street, 25th Floor
Houston, Texas 77002
(713) 651-2600

*Attorneys for
Smith International, Inc.*

October 24, 2016

# AMENDED CERTIFICATE OF INTEREST

## APPEAL NO. 2016-2303

## IN RE:  SMITH INTERNATIONAL, INC.,

Counsel for Appellant certifies the following:

1.  The full name of the party represented by me is:

    Smith International, Inc.

2.  The name of the Real Party in Interest represented by me is:

    Smith International, Inc.

3.  All parent corporations and any publicly held companies that own ten percent or more of stock in the party are:

    Schlumberger Holdings Corporation and Schlumberger N.V.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

    None (only those entering appearances before this Court)

Dated:  October 24, 2016       Respectfully submitted,

/s/ John R. Keville
John R. Keville
WINSTON & STRAWN LLP
1111 Louisiana Street, 25th Floor
Houston, TX  77002
Telephone:  (713) 651-2600
Facsimile:  (713) 651-2700
Email:  jkeville@winston.com

*Attorneys* for *Smith International, Inc.*

i

# TABLE OF CONTENTS

Page

I.    JURISDICTION .......................................................................1

II.   STATEMENT OF ISSUES ........................................................1

III.  STATEMENT OF THE CASE ....................................................4

IV.   STATEMENT OF FACTS ..........................................................7

    A.    The '817 Patent Teaches Novel Downhole Tool
       Configurations .................................................................7

    B.    The Term "Body" As Used In The '817 Patent Claims
       And Specification Refers To A Specific Structural
       Component Of The Downhole Tool ...................................10

    C.    The Independent Claims On Appeal ................................12

    D.    The Applied Prior Art Does Not Disclose Or Teach The
       Novel Configuration Disclosed And Claimed By The
       '817 Patent ...................................................................14

       1.    Eddison Uses Distinct Mandrel And Cam Sleeve
          Components Which Move Relative To The Tool's
          Body To Drive The Cutters Radially Outward .......................14

       2.    Jewkes Does Not Disclose Downhole Tool
          Configurations, But Merely The Combination Of
          A Stabilizer And A Underreamer On A Drill String ...............18

       3.    Wardley Does Not Disclose A Downhole Tool
          Configuration, But Only A Particular Drill Bit .......................18

    E.    The Examiner's Final Rejections Depend On The
       Mistaken Premise That Eddison's Cam Sleeve Meets The
       Claimed "Body" Limitation ...............................................19

       1.    The Group I Claims Were Rejected As Anticipated
          By Eddison ...............................................................19

       2.    The Group II Claims Were Rejected As Obvious
          Over Eddison And Jewkes .............................................23

       3.    The Group III Claims Were Rejected As Obvious
          Over Eddison, Wardley, And Jewkes .................................24

F.  The Board Perpetuates And Reinforces The Faulty
Rationales For The Final Rejections ...................................................24

V.  SUMMARY OF ARGUMENT ....................................................................27

VI.  ARGUMENT ...............................................................................................30

A.  Standards Of Review ...........................................................................30

B.  The Board's Interpretation Of "Body" As A Generic, All-
Encompassing Term Is Divorced From The Written
Description And Is Unreasonable ........................................................31

1.  The BRI Standard Does Not Allow A Legally
Incorrect Construction .............................................................31

2.  The '817 Patent Utilizes The Common Meaning
Of "Body" As Being The Tool's Outer Housing.....................35

3.  The "Body" Is Consistently Described In The '817
Specification And Figures As A Specific
Component Of The Tool............................................................38

4.  The Board Distorted The Specification To
Interpret "Body" As Including Any Component
That Defines The Tool's Flowbore...........................................42

5.  The Claims Establish That "Body" Is A Specific
Component That Is Distinct From Other Identified
Components ...............................................................................44

6.  The Other Patents Of Record Show That "Body"
Has The Same Common And Ordinary Meaning.....................49

7.  Eddison's Own Disclosure Establishes That Its
Cam Sleeve Is Not Part Of Its Body ........................................51

C.  The Term "Body" In The '817 Patent Is Not A Generic,
All-Encompassing Term Like "Member" Or "Element"....................53

D.  Under The Correct Interpretation Of "Body," All Of The
Challenged Rejections Should Be Reversed ........................................57

1.  The Rejections Of Claims 39 and 41 Further
Illustrate The PTO's Misunderstanding of Eddison .................58

2.  The Anticipation Rejections Of Claims 34-36
Reflect Additional Construction Errors ....................................60

3.      The Anticipation Rejections Of Claims 93-100
        Also Reflect Additional Construction Errors............................61

VII.   CONCLUSION.................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Systems, Inc.*,
  261 F.3d 1329 (Fed. Cir. 2001) ........................................................54

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
  637 F.3d 1324 (Fed. Cir. 2011) ........................................................48

*Belden Inc. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015) .................................................30, 58

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns. Grp., Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001) ........................................................41

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ..........................................................................30

*In re Cortright*,
  165 F.3d 1353 (Fed. Cir. 1999) ...........................................32, 49, 50

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) ........................................................45

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006) ........................................................56

*Dayco Prods., Inc. v. Total Containment, Inc.*,
  258 F.3d 1317 (Fed. Cir. 2001) ........................................................60

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix*,
  672 F.3d 1270 (Fed. Cir. 2012) ........................................................48

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) ..............................................................................58

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) ..........................................................30

*In re Katz Interactive Call Processing Patent Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011) ........................................................41

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
285 F.3d 1353 (Fed. Cir. 2002) ..........................................................41

*In re: LF Centennial Ltd.*,
2016 WL 3545686 (Fed. Cir. June 29, 2016) ...............................40, 41

*Marsh-McBirney, Inc. v. Montedoro-Whitney Corp.*,
882 F.2d 498 (Fed. Cir. 1989) ...........................................................36

*Mas-Hamilton Group v. LaGard, Inc.*,
156 F.3d 1206 (Fed. Cir. 1998) ..........................................................54

*Microsoft Corp. v. Proxyconn, Inc.*,
789 F.3d 1292 (Fed. Cir. 2015) ...................................................*passim*

*In re NTP*,
654 F.3d 1279 (Fed. Cir. 2011) ...................................................32, 57

*Prolitec, Inc. v. Scentair Techs., Inc.*,
807 F.3d 1353 (Fed. Cir. 2015) ........................................................30

*In re Rambus, Inc.*,
753 F.3d 1253 (Fed. Cir. 2014) .........................................................30

*Rambus Inc. v. Infineon Techs. Ag*,
318 F.3d 1081 (Fed. Cir. 2003) .........................................................45

*Retractable Techs., Inc. v. Becton, Dickinson and Co.*,
653 F.3d 1296, *reh'g denied*, 659 F.3d 1369 (Fed. Cir. 2011)..........................37

*Rodime PLC v. Seagate Technology, Inc.*,
174 F.3d 1294 (Fed. Cir. 1999) .........................................................45

*In re Skvorecz*,
580 F.3d 1262 (Fed. Cir. 2009) .........................................................32

*Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*,
806 F.3d 1356 (Fed. Cir. 2015) ........................................................30

*In re Suitco Surface, Inc.*,
603 F.3d 1255 (Fed. Cir. 2010) ...................................................32, 35

*Sunrace Roots Enter. Co. v. SRAM Corp.*,
   336 F.3d 1298 (Fed. Cir. 2003) ...........................................................................48

*Trivascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) ..................................................................38, 56

*In re Varma*,
   816 F.3d 1352 (Fed. Cir. 2016) .........................................................................30

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ...................................................................39, 50

*Walberg v. Probst*,
   474 F.2d 683 (CCPA 1973) ...............................................................................37

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) .........................................................................55

## Statutes

28 U.S.C. § 1295(a)(4)(A) ..........................................................................................1

35 U.S.C. § 6(b) ..........................................................................................................1

35 U.S.C. § 134(b) ......................................................................................................1

35 U.S.C. § 141 ...........................................................................................................1

## Rules

Fed. Cir. R. 32.1(d) ...................................................................................................40

# ABBREVIATIONS

| | |
|---|---|
| Smith | Smith International, Inc. |
| Schlumberger | The parent companies of Smith, Schlumberger Holdings Corporation and Schlumberger N.V. (also referred to in the U.S. as Schlumberger Ltd.), collectively |
| '817 Patent | U.S. Patent No. 6,732,817 (Appx29-46) |
| Baker Hughes | Baker Hughes, Inc., the defendant in the related district court litigation involving the '817 patent |
| PTO | United States Patent and Trademark Office |
| Board | PTO Patent Trial and Appeal Board |
| BRI | broadest reasonable interpretation |
| IPR | *inter partes* review |
| PCT | Patent Cooperation Treaty |
| EP | European Patent |
| Eddison | WO 00/31371 (published June 2, 2000) (Appx382-407) |
| Jewkes | U.S. Patent No. 6,059,051 (issued May 9, 2000) (Appx408-417) |
| Wardley | EP 0 246 789 (issued Nov. 25, 1987) (Appx418-428) |
| Appx____ | Page ____ in Joint Appendix |
| Appx(xx:yy-zz) | Page ____ in Joint Appendix citing to column xx and lines yy through zz of a patent |

**NOTE:  All emphasis in quotations in the brief has been added unless otherwise indicated.**

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), counsel for Smith states that there has been no other appeal in this proceeding from the PTO that was previously before this Court or any other appellate court. Pursuant to Fed. Cir. R. 47.5(b), counsel for Smith states that the Court's decision in this appeal may affect the following district court action involving U.S. Patent No. 6,732,817, which is the patent at issue in the underlying *ex parte* reexamination proceeding that is the subject of the present appeal.

In December 2012, Smith, Smith's corporate parent (Schlumberger), and another related entity brought a lawsuit involving breach of contract, patent infringement, and several other causes of action against Baker Hughes in the U.S. District Court for the Southern District of Texas. The patents at issue included the '817 patent and U.S. Patent No. 7,314,099 ("the '099 patent"). *Schlumberger Tech. v. Baker Hughes, Inc.*, No. 4:12-cv-03573 (S.D. Tex., filed Dec. 7, 2012). The '099 patent is a continuation of a divisional of the application that issued as the '817 patent.

Shortly thereafter, on July 3, 2013, Baker Hughes filed the reexamination request resulting in the present proceeding. After certain of the causes of action in the Texas lawsuit were ruled to be subject to a preexisting arbitration agreement, the

infringement claims based on the '817 patent and the '099 patent were dismissed without prejudice.

Immediately thereafter, in January 2016, Smith filed a separate patent infringement lawsuit against Baker Hughes involving the '817 patent and the '099 patent in the U.S. District Court for the District of Delaware. *Smith Int'l, Inc. v. Baker Hughes Inc.*, No. 1:16-cv-00056 (D. Del., filed Jan. 29, 2016) (pending before the Honorable Sue Robinson). Subsequent to the Delaware lawsuit, Baker Hughes filed IPR petitions against the '817 patent and '099 patent in the PTO. A decision to institute on either petition is not expected from the PTO until January 2017.

This Court's resolution of the disputed claim construction issue presented by the present appeal will therefore likely affect any further district court and PTO proceedings. Specifically, the disputed claim term "body" is present not just in the rejected claims of the '817 patent that are the subject of the present appeal, but in other claims of that patent that were not reexamined or were allowed. Some of those claims are also at issue in the pending litigation and in the petition for *inter partes* review. Moreover, the claims of the related '099 patent are based on the same underlying specification.

# I.    JURISDICTION

The Board had jurisdiction pursuant to 35 U.S.C. §§ 6(b), 134(b).   The Board's Final Decision issued on April 29, 2016.  Appx1-9.  Smith timely appealed on June 29, 2016.  Appx27-28.  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.

# II.    STATEMENT OF ISSUES

This appeal is from an *ex parte* reexamination decision in which 29 of the 102 issued or pending claims of Smith's '817 patent were deemed unpatentable as anticipated by Eddison and/or as obvious in view of Eddison and additional references.  All of the rejections at issue depend entirely on the Board's erroneous interpretation of "body" as used in the claims.

Each claim at issue pertains to an expandable downhole drilling tool comprising "a body" and at least one "non-pivotable, moveable arm" having angled surfaces that "engage the body."  As disclosed in the specification, angled extensions on opposing sides of each arm engage corresponding channels in the sides of the associated recess within the body while the arms move axially upwardly and radically outwardly into their expanded position.

The prior art Eddison reference discloses a downhole tool having a body and at least one non-pivotable, movable member (also called a cutter), which the Examiner treated as meeting the "arm" limitation.  However, the member/cutter in

Eddison has no angled surfaces that "engage" the "body" of the tool. Instead, the only angled surfaces on Eddison's member/cutter are a dovetail slot on its rear face which intermeshes with a corresponding dovetail profile on Eddison's cam sleeve, which is a distinct component from its body. Eddison's cam sleeve is screwed into the tool's mandrel, another separate component around which the body is movably mounted. Once sufficient weight is applied to shear a restraining pin, the mandrel in Eddison can move axially downward into the body such that the attached cam sleeve slides downward against the rear face of the member/cutter, thereby causing it to move radially outward.

To make the rejections at issue, the Examiner and the Board erroneously construed the term "body" in the '817 patent claims as being an all-encompassing, generic term that includes every component of the claimed downhole tool that is not specifically recited in the claims. That construction ignores that the common and ordinary meaning of "body" is the tool's outer housing. Moreover, that construction is entirely inconsistent with the specification, the record evidence, and the accepted understanding in the art that a "body" is a specific structural component of a downhole tool.

Indeed, the Board expressly agreed that "the '817 patent describes a body as a discrete element separate from other elements." Nevertheless, the Board held that the broadest reasonable interpretation of "body" could encompass three separate

elements of Eddison—mandrel 16, body 18, and cam sleeve 28— collectively such that the dovetail interaction between the cam sleeve and rear face of the member/cutter in Eddison meets the claimed requirement that angled surfaces of the arm engage the "body" of the downhole tool.

The Board's construction of "body" is wrong as a matter of law. Because Eddison's cam sleeve cannot reasonably be interpreted as being part of the "body" of the claimed invention, the Board's anticipation and obviousness rejections cannot stand. Hence, the following issues are presented:

1.      Whether the Board unreasonably interpreted "body" in the '817 patent to encompass the separately-identified mandrel, body, and cam sleeve components of the prior art Eddison reference?

2.      Whether the Board unreasonably interpreted "body" in the '817 patent contrary to its ordinary meaning of being the outer housing of a downhole tool and in a manner divorced from the specification, the record evidence and the understanding in the art, which uniformly establish that "body" is a specific structure distinct from other separate tool components (such as the mandrel) which may be within the tool's body?

3.      Whether the Board unreasonably interpreted "body" in the '817 patent to be a generic term like "member" or "element" that provides no structural

specificity and which is merely a placeholder that encompasses all disclosed components of the claimed tool not specifically recited in the claims?

4.    Whether the Board's unpatentability rejections, which all depend directly on its erroneous interpretation of "body," must be reversed because the member/cutter in Eddison does not have angled surfaces that engage the claimed "body" when properly construed?

5.    Whether the Board's rejections of claims 34-36, 39, 41, and 93-100 must also be reversed due to additional claim construction errors?

## III.    STATEMENT OF THE CASE

The '817 patent relates to expandable downhole tools used in oil and gas operations, and specifically to underreamers and stabilizers.    Appx38(1:21-24); Appx39(4:54-59).    Expandable underreamers are "used for enlarging a borehole below a restriction" while stabilizers are "used for controlling the trajectory of a drill bit" while drilling a borehole.    Appx38(1:16-21).    The '817 patent issued on May 11, 2004 with 73 claims.    Appx29; Appx44-46(14:16-18:50).

On July 3, 2013, Baker Hughes requested *ex parte* reexamination of certain claims of the '817 patent.    Appx47; Appx80-81.    On August 16, 2013, the PTO initiated the reexamination proceedings leading to this appeal.    Appx80-89.

On October 2, 2013, the first Office Action rejected all involved claims as anticipated or obvious.    Appx91-93.    On December 2, 2013, Smith responded while

adding new claims 74-92. Appx106-133. On February 14, 2014, the Examiner rejected all involved claims, and deemed the action final. Appx134-147. On April 14, 2014, Smith responded, while identifying procedural errors precluding final rejection. Appx162-200.

On April 28, 2014, the Examiner vacated the finality ruling, withdrew some rejections, but maintained or entered amended rejections on all remaining claims. Appx208-227. On June 30, 2014, Smith made additional arguments, canceled some claims, amended others, and added new claims 93-102. Appx229-252. In particular, Smith amended independent claim 28 to incorporate dependent claim 37 (which was canceled), thereby requiring "at least one non-pivotable moveable arm" with "angled surfaces that engage said body to prevent said arm from vibrating in said second position." Appx232-233; Appx244. Independent method claim 43 was similarly amended to require "at least one arm having angled surfaces that engage a body." Appx234.

On August 25, 2014, the Final Office Action allowed claims 82-91 and 101-102, but maintained all other rejections. Appx253-273. In the Examiner's view, the term "body" did not impart structural features, was not a term of art, and had not been specifically defined in the specification. Appx268. The Examiner thus declared that it was reasonable that "the prior art components, i.e. the body, mandrel and cam, of Eddison taken together meet the claimed 'body.'" Appx268. On

October 27, 2014, Smith responded, explaining that Eddison's cam and mandrel were not within the claimed "body" or even part of the "body" of Eddison's tool. Appx292-295.

On November 14, 2014, the Examiner issued a supplemental Advisory Action to further explain the PTO's positions. Appx301-309. On Smith's appeal, the Board recognized that the '817 patent, the Eddison prior art, and other patents in the art all describe "body" as a discrete component, but nevertheless affirmed all rejections. Appx1-9.

For the Court's convenience, the post-reexamination status of all 102 claims is summarized below. Claims 1-27, 38, 47-48, and 51-73 were not reexamined. *See* Appx93. Claims 37, 74-78, and 92 were canceled during the reexamination proceedings. Appx17; Appx22; Appx25. Claims 82-91 and claims 101-102 were added during reexamination and later allowed. Appx273.

The rejected claims fall into three groups. Claims 28-36, 39-40, 42, 79-80, and 93-98 ("Group I claims") were rejected as anticipated by Eddison.[1] Appx257. Claims 43-46 and 49 ("Group II claims") were rejected as obvious over Eddison in

---

[1] Claim 100 is not listed in the Board's decision. *See* Appx2-9. However, claim 100 was rejected with the Group I claims. Appx261; Appx273. Smith's response addressed claim 100 with the Group I claims. Appx291; Appx296-97. Moreover, Smith's appeal to the Board included claim 100. Appx310. Hence, claim 100 is treated herein with the Group I claims.

view of Jewkes.  Appx262.  Finally, claims 28, 40-41, 43, 50, 80-81, 93, and 99

("Group III claims") were rejected as obvious over Eddison in view of Wardley and

Jewkes.  Appx264.

On June 29, 2016, Smith timely appealed to this Court.  Appx27-28.

## IV.    STATEMENT OF FACTS

**A.    The '817 Patent Teaches Novel Downhole Tool Configurations**

The expandable downhole tool of the '817 patent can be used for reaming

(enlarging) a borehole or for gauge protection (centralizing) a drill string.  The

claimed tool comprises "a body" and "at least one axial recess in the body and at

least one moveable arm."  Appx39-40(4:60-5:9).  Preferably, the tool includes three

such arms (spaced 120° apart) that are biased to a collapsed position by a spring.

Appx40(5:11-14); Appx42-43(9:65-10:5).  The tool moves between collapsed and

expanded positions in response to differential fluid pressure.  Appx39(4:62-67).  As

the tool actuates to the expanded position, "the arms are translated axially upwardly,

while simultaneously being extended radially outwardly from the body."

Appx40(5:13-15).

Figure 4 shows one embodiment of the tool in a collapsed position, whereas

Figure 5 shows such tool in its expanded position.  Appx32-33; Appx40(5:59-65).

7



Fig. 4

Fig. 5

The disclosed tool 500 comprises a tool body 510 (colored green) having threaded

connections 514 and 512 in the top and bottom for connecting to the drilling

assembly.  Appx41(7:66-8:3).  Pocket recesses 516 are formed in the body, with

moveable arms 520 (colored yellow) located in each recess.  Appx41(8:3-18).  "The

arms include borehole engaging pads that comprise cutting structures or wear

structures or both, depending on" how the tool will be used.  Appx40(5:20-24);
Appx42(9:30-36) (cutting structures underream the borehole while wear structures
provide gauge protection); *see also* Appx41(8:57-60).

The sides of the pocket recesses include "angled channels 518 that provide a
drive mechanism for the moveable tool arms 520 to move axially upwardly and
radially outwardly into the extended position of FIG. 5." Appx41(8:19-22).  Each
arm 520 includes extensions 650 disposed along each side 528, which preferably
extend upwardly at an angle.    Appx31(Fig. 6);  Appx34-35(Figs. 8-10);
Appx42(10:31-35).  Notably, "[t]he extensions 650 protrude outwardly from the arm
520 to fit within corresponding channels 518 in the pocket recess 516 of the tool
body 510, as shown in Figs. 4 and 5." Appx42(10:35-38).  This configuration
increases the surface contact between the arms and body, "thereby providing a more
robust expandable tool 500 as compared to prior art tools." Appx42(10:38-42).

A drive ring 570 that engages piston 530 is below the moveable arms.
Appx41(8:29-34).  When the piston moves axially in the pocket recesses in response
to differential fluid pressure, the drive ring moves upward against the arms, which
move axially upwardly and radially outwardly "as the arms travel in channels 518
disposed in the body 510." Appx41(8:33-34); Appx(9:36-54).  The embodiment of
Figures 4-5 includes an inner mandrel 560 (colored red, above), described as "the
innermost component within the tool." Appx41(8:36-40).

9

Figures 11 and 12 depict a second embodiment, generally designated as tool 900, also in the collapsed and expanded positions. Appx36-37; Appx40(6:9-15); Appx43(11:65-67). Many components of tool 900 are the same as in tool 500 of Figures 4 and 5, and thus retain the same reference numerals, but there are several differences. Appx43(11:67-12:3). In one notable example:

> [t]he inner mandrel 560 of the first embodiment tool 500 is replaced by a stinger assembly 910, preferably comprising an upper inner mandrel 912, a middle inner mandrel 914, and a lower inner mandrel 916.

Appx43(12:4-7). Thus, rather than the one-piece mandrel 560, the second embodiment utilizes a three-part mandrel, which is recited as "a stinger" in claims 17-18. Appx44-45(14:66-15:5).

## B. The Term "Body" As Used In The '817 Patent Claims And Specification Refers To A Specific Structural Component Of The Downhole Tool

The '817 patent consistently uses the term "body" to refer to one specific structural component of the downhole tool, *i.e.*, the outer housing. Appx41(7:66-8:1). The body thus generally defines the tool's outer diameter in the retracted position, and houses the tool's other distinct components.

The '817 specification uses the terms "body" and "tool body" interchangeably when describing the component numbered as 510. *See, e.g.*, Appx41(7:66-8:6). The specification further establishes that "body 510" is distinct from other tool components that may interact with, be attached to, or be located within the body,

10

such as the mandrel or other axially-arranged structures like the springs, drive ring, spring retainer, and piston.  Appx41(8:23-67); Appx42(9:40-61).

For example, the specification distinguishes the "inner mandrel 560" and "body 510" as distinct components.  *See* Appx41(8:43-45) ("The upper cap 555 sealingly engages the body 510 at 505, and sealingly engages the inner mandrel 560 at 562 and 564."); Appx41(8:60-62) ("Below the arms 520, the piston 530 sealingly engages the inner mandrel 560 at 566, and sealingly engages the body 510 at 534."). Similarly, in the embodiment of Figures 11-12, the numbering of the "body" as 510 remains unchanged, while the stinger assembly 910—comprising three inner mandrel portions (912, 914, and 916)—remain identified as distinct components. Appx43(12:4-22).

In that manner, the numbering of the discrete tool components, as reflected in the figures, confirms that the '817 patent consistently distinguishes between the claimed "body" and the other components located within the body.  Figures 4-5 and Figures 11-12 each uniquely label and number the "body" as 510, and utilize unique hatching to distinguish the "body" from the other uniquely-numbered and uniquely-hatched tool components arranged within the body.  *See* Appx32-33; Appx36-37. Nothing in the specification indicates that "body" as used in the '817 patent refers to or extends beyond that one particular structure.

The tool 500 comprises a generally cylindrical body with a flowbore extending therethrough.    Appx41(7:66-8:1).    Other separate components are arranged within the body 510 circumferentially around the flowbore and thus will also further define or narrow the tool's flowbore without obstructing the overall flow of drilling fluid.  *See, e.g.,* Appx32-33; Appx42(9:15-17) (spring retainer 550); Appx43(12:23-24).    However, the general arrangement of the tool's other components around the flowbore does not transform those components into part of the tool's body.

## C.    The Independent Claims On Appeal

Of the claims at issue, claims 28, 43, and 93 are the independent claims.  As amended during reexamination, claim 28 recites in pertinent part:

> An expandable downhole tool for use in a drilling assembly positioned within a wellbore having an original diameter borehole and an enlarged diameter borehole, ***comprising***:
>
> ***a body***; and
>
> ***at least one non-pivotable, moveable arm*** having at least one borehole engaging pad adapted to accommodate cutting structures or wear structures or a combination thereof and ***having angled surfaces that engage said body*** to prevent said arm from vibrating in said second position; … .

Appx15-16.

Claim 43 is a method claim which, as amended during reexamination, recites in pertinent part:

12

> A method of underreaming a wellbore to form an enlarged borehole and controlling the directional tendencies of a drilling assembly within the enlarged borehole, ***comprising***:
>
> …
>
> disposing a first expandable tool having at least one arm including at least one borehole engaging pad, the pad being configured for underreaming directly above the drill bit and the ***at least one arm having angled surfaces that engage a body of the first expandable tool***; … .

Appx17-18.

Finally, independent claim 93 was added during the reexamination and recites

in pertinent part:

> An expandable downhole tool for use in a drilling assembly positioned within a wellbore having an original diameter borehole and an enlarged diameter borehole, ***comprising:***
>
> ***a body*** defining an outermost diameter of the expandable downhole tool when the tool is in a retracted configuration; and
>
> ***at least one non-pivotable, moveable arm*** having at least one borehole engaging pad adapted to accommodate cutting structures or wear structures or a combination thereof and ***having at least one surface that engages the body wherein the body is configured to guide a direction of translation of the non-pivotable, moveable arm along the at least one surface of the arm and a surface of the body***; … .

Appx25. Notably, the '817 patent as originally issued and attached hereto (Appx29-46) does not contain the reexamination amendments. The full post-reexamination text of all 102 claims is at Appx13-26.

**D.     The Applied Prior Art Does Not Disclose Or Teach The Novel Configuration Disclosed And Claimed By The '817 Patent**

**1.     Eddison Uses Distinct Mandrel And Cam Sleeve Components Which Move Relative To The Tool's Body To Drive The Cutters Radially Outward**

Eddison describes "[a] downhole tool … compris[ing]: a mandrel (16); a body (18) axially movably mounted on the mandrel; and radially extendable members." Appx382.  Because Eddison also describes its member as "cutter 30" (Appx393-394), they are referenced herein as "member/cutters."  The members/cutters are "mounted in the body" and "operably associated with the mandrel" such that axial movement of the mandrel downwardly into the body induces outward radial movement of the member/cutters whereas application of axial tension to the tool moves the body axially upwardly away from the mandrel, which retracts the member/cutters from an extended configuration. *See* Appx382; Appx385(2:19-25).

Eddison's Figure 1 and 2 (initial and cutting configurations) are reproduced below, with the body 18 (green), mandrel 16 (red), and cam sleeve 28 (blue) highlighted.  Appx391-392(8:27-9:4); Appx392-393(9:21-10:7).

14



Fig. 1          Fig. 2

Appx403.  Separately distinguished from the body, Eddison's mandrel is described as "extending into the tubular body 18 for coupling to the drill bit," such that "[t]he mandrel 16 and body 18 collectively define a central through bore 20 to allow passage of drilling mud to the drill bit."  Appx392(9:21-26).

Eddison's preferred means for moving each member/cutter utilized "an undercut groove on one of the mandrel and [member/cutter] and a corresponding

15

profile on the other, which groove and profile may be of a T-slot or dovetail configuration." Appx386-387(3:28-4:4). That dovetail relationship caused each member/cutter to be "operatively associated with the mandrel." Appx387(4:12); Appx388(5:19). Eddison also explained that "the mandrel defines a cam surface for co-operating with an inner face of the [member/cutter]" and that in certain embodiments, "the faces of the mandrel and [member/cutter] positively engage." Appx390(7:7-10). Eddison thus described the cam sleeve as the face of the tool's mandrel, not as part of its body. *See* Appx391(8:14-16) (tool provides "one or more [member/cutters] … mounted to a mandrel by dovetails").

As shown above in Figures 1 and 2, "[t]he mandrel 16 steps downwardly in cross-section as it extends through the body 18, and provides mounting for a cam sleeve 28 which is threaded to the mandrel 16 and co-operates with three extendable [members/cutters] in the form of cutters 30 mounted in respective body ports 32." Appx393(10:4-8). The dovetail profile of the cam sleeve face slides within the corresponding dovetail slot of the member/cutter whenever the mandrel and body move axially relative to each other. Appx395(12:3-8).

Eddison's cam sleeve 28 is detailed in Figures 3 and 4 (reproduced below).

16



Fig. 3          Fig. 4

Appx404. The cam sleeve includes "three cam surface portions," 34, 35, and 36, which "carry a respective dovetail profile 38, 39, 40." Appx393(10:10-12). It is these dovetail profiles that engage a corresponding dovetail slot (42) on each of the respective member/cutters (30), as shown in Figures 5 and 6 (below). Appx393(10:12-15); Appx405.



Fig. 5          Fig. 6

As shown, the dovetail slot is on the rear face of the member/cutter so there are no angled surfaces on the faces that pass through ports 32 in the tool body.  Further, if weight is taken off the mandrel, the members/cutters are positively withdrawn and thus cease any cutting capability or other function.  Appx396(13:16-21).

## 2.     Jewkes Does Not Disclose Downhole Tool Configurations, But Merely The Combination Of A Stabilizer And A Underreamer On A Drill String

Jewkes discloses an apparatus for use in drilling operations but, unlike Eddison, is silent about any particular tool design.  *See* Appx408-417.  Instead, Jewkes is concerned with only the relative placement of such tools on a drill string "to minimize the distance between the stabilizer and the under-reamer."  *See* Appx415(2:48-51); Appx416(3:57-61).  The Examiner used Jewkes with Eddison to hold that the Group II claims would have been obvious, and together with Eddison and Wardley to hold that the Group III claims would have been obvious.  Appx262-264.  However, Jewkes itself has no bearing on the proper interpretation of "body" in the '817 patent.

## 3.     Wardley Does Not Disclose A Downhole Tool Configuration, But Only A Particular Drill Bit

Wardley relates to a "cutter, for use in a rotary drill bit" which comprises a "number of thermally stable polycrystalline diamond elements 21 at least partly embedded in a slug 20 of cemented tungsten carbide."  Appx418-428, at Appx418; Appx420(4:46-52); Appx426 (Figures 1-2).  "The bit gauge section 15 includes

kickers 16 which contact the walls of the borehole to stabilise the bit in the borehole." Appx422(7:16-18). The Examiner relied only on Wardley's teaching of stabilizing kickers together with selected teachings of Eddison and Jewkes to hold that the Group III claims would have been obvious. Appx264-267. Nevertheless, Wardley itself also has no significance to the proper interpretation of "body" as used in the '817 patent.

## E. The Examiner's Final Rejections Depend On The Mistaken Premise That Eddison's Cam Sleeve Meets The Claimed "Body" Limitation

### 1. The Group I Claims Were Rejected As Anticipated By Eddison

For independent claims 28 and 93, the Examiner held that the claimed "body" was met by Eddison's "mandrel 16, body 18, and cam 28." Appx257. The Examiner found that Eddison's tool has "angled contact surfaces … in the same way as the tool of the '871 [*sic*] patent," because the "at least one non-pivotable, moveable arm" in Eddison "further comprises angled surfaces (dovetail slots 42, *see* Fig. 1, 2, 6) that engage said body (dovetail profiles 28, 39, 40 on cam, *see* Fig. 3, 4)." Appx259. Thus, the Examiner explicitly found that the dovetail slots on Eddison's member/cutter were "angled surfaces" that "engage" the "body" by interconnecting with the dovetail profiles on Eddison's cam sleeve.

The Examiner stated that "the claim term 'body' is broad and is commonly used in apparatus claims to represent a housing or central/main portion of the device." Appx268. However, eschewing that definition, the Examiner instead held

19

that the broadest reasonable interpretation was that "the body, mandrel and cam, of Eddison taken together meet the claimed 'body.'" Appx268. According to the Examiner, the term "body" did not impart structural features and is not recognized as a term of art, and was not given a specific definition in the '817 specification. Appx268.

Nevertheless, the Examiner's explanation twice recognized that "body" is a specific component that is a "portion" or "part" of the overall tool:

> Therefore, ***the structure of the body is the main cylindrical portion of the device*** that defines the central conduit. Importantly, no structural restrictions are imparted by the '817 patent specification to the body. Additionally, the body of the '817 patent includes not just a housing but also mechanical features such as threads. Furthermore, according to Merriam-Webster online dictionary, ***body has a myriad of understandings, including "the main, central, or principal part.***"

Appx268-269. However, apparently because "a body" was recited in the claims without further limitation, the Examiner rejected Smith's position that "body" represented a specific component of the claimed tool because it would "amount to importing limitations from the specification into the claims without amending the claims." Appx269.

Nevertheless, the Examiner explicitly utilized the ordinary meaning of "body" in the next sentence by substituting the term "external housing" for "body 18" when listing Eddison's three components that allegedly met the "body" of the '817 patent: "calling the prior art configuration of ***an external housing***, a mandrel and a cam a

20

body is not inconsistent with the '817 patent specification since the prior art 'body' would structural [*sic*] resemble and functionally perform as the claimed 'body.'" Appx269. Nevertheless, the Examiner finally declared that "[i]f … the mandrel and cam of Eddison are prevented from reading on the claim limitation of a 'body'; limitations, not present in the claim, would be included in the interpretation of 'body' thereby rendering the claim indefinite." Appx269.

For dependent claim 36, which requires a plurality of extensions on the arm that fit within a plurality of channels in the body to "support loading" when in the extended position, the Examiner stated that the dovetail slot and dovetail profile on the arm and cam sleeve in Eddison satisfied that limitation. Appx269 ("[t]he mere mechanical linkage of the extensions and the channels provides the evidence that the prior art meets the claim language."). The Examiner did not explain how the sliding dovetail arrangement between Eddison's member/cutter and cam sleeve constituted a mechanical linkage that supported any loading.

The Examiner's supplemental Advisory Action introduced the following analogy to support the PTO's interpretation:

> [P]atent owner is ignoring the broadness of the claim term "body". As an example, the human body itself negates patent owner's above statement. The human body includes subcomponents such as arms, legs, and a head which are attached to the torso or as some would say the body. While the components have their own names, they are still considered as part of the total body. Further, the human body has internal organs such as the heart, lungs, and liver that have their own names, structure and function. These organs are located specifically

21

within the torso of the body but some would just state that they are inside the body. However, they are also part of the body and are included if one were to generally refer to the human body.

Appx304. The Advisory Action explained that Eddison's "body and mandrel together form a structural relationship identical to that of the body in the '817 patent," because Eddison's "mandrel 16 and body 18 collectively define a central through bore." Appx305 (quoting Appx392). Despite conceding that the cam sleeve "has its own name and function," the Examiner held that cam 28 "being positioned between the mandrel 16 and the body 18 [is] part of the overall body that reads on the claimed body of the '817 patent." Appx305.

On claim 93, the Examiner held that Eddison's ports 32 met the limitation that "the body is configured to guide a direction of translation" of the arm along a surface of the body. Appx306. According to the Examiner, the opening in Eddison's body itself guides the direction of translation of its arm and "there must by necessity be engagement between the surfaces of the port 32 and the arm 30." Appx306-307.

Claim 96 added that the tool of claim 93 further comprises "at least two angled surfaces on each of the at least two opposite sides of the arm." Appx26. The Examiner reasoned that "the claim term 'opposite sides' is relative and the claim does not include a reference point." Appx307. Using a figure from Smith's response (Appx298), the Examiner found that the facing surfaces of the dovetail slot on Eddison's arms were on opposite sides of the axis of the arms. Appx307-308.

22

However, the Examiner did not address the requirement for "at least two [such] angled surfaces" on each of the opposite sides of the arm.

### 2.     The Group II Claims Were Rejected As Obvious Over Eddison And Jewkes

Consistent with the anticipation rejections, the Examiner repeated the premise that the dovetail slots 42 on Eddison's arm comprise angled surfaces that engage the body by their configuration with the "dovetail profiles 28, 39, 40 on [the] cam." Appx262. Absent that interpretation, the Group II claims could not have been held obvious.

The Examiner separately agreed that Eddison did not teach the step of disposing a second expandable tool having at least one arm configured for stabilizing above the first expandable tool and using the second expandable tool to control the directional tendencies of the drilling assembly. Appx263. Finding Jewkes disclosed that step, the Examiner held that "it would have been obvious … to incorporate a stabilizer … into the under reamer of Eddison … [to] provide the advantage of consistent directional control and stability of the under reamer as taught by Jewkes." *Id.*

### 3.   The Group III Claims Were Rejected As Obvious Over Eddison, Wardley, And Jewkes

The Examiner again relied on Eddison "[meeting] the claim limitations as described above for claims 28 and 93." Appx264. Absent that interpretation, the Group III claims also could not have been held obvious.

The Examiner agreed that Eddison did not teach an engaging pad having a combination of wear/stabilizing structures and cutting structures. Appx264. However, the Examiner relied on Wardley as disclosing stabilizing kickers, *i.e.*, wear/stabilizing structures imparting gauge protection capability, which the Examiner held would have been obvious to incorporate into Eddison's invention to take advantage of Jewkes' teachings. Appx265-266.

### F.   The Board Perpetuates And Reinforces The Faulty Rationales For The Final Rejections

Reviewing whether "body" in the '817 claims could reasonably encompass Eddison's mandrel and cam sleeve, the Board agreed that "the '817 patent "*describes a body as a discrete element separate from other elements*," but then held that "does not in and of itself proscribe the Examiner's construction." Appx5 (emphasis in original). Agreeing with the Examiner that the patentee had not acted as its own lexicographer or defined "body" to preclude the Examiner's interpretation, the Board held that "'body' as used in the claims is essentially a generic term such as 'member' or 'element' that by itself provides no structural specificity." Appx5.

The Board dismissed Smith's evidence of how the art understood the term "body" as showing only "that other patents also sometimes describe a 'body' as a discrete element as compared to other elements not called a body" without specifically defining "body" within the art. Appx5-6. Instead, the Board viewed the "body" in each reference as having a different structure and purpose in each specific tool. Appx5.

The Board next rejected Smith's position that whether the disclosed mandrel was recited in the claims at issue should not affect the interpretation of "body" as used in the '817 patent:

> Had the Patent Owner included other specific elements in the claims to differentiate what is and is not a body in the claims (i.e., if the claim also included a mandrel as a separate element from the claimed body, then obviously a mandrel cannot be a body), then it would be more clear that a body is merely an element of the overall tool rather than a generic, all-encompassing term. The claims, however, essentially recite only a body and the movable cutting arms, such that it is perfectly reasonable to conclude, as the Examiner has done, that the term "body," when given its broadest reasonable construction in the claims, merely refers to the overall portion or portions of the downhole tool that define the bore and may include one or more elements.

Appx6. The Board resurrected the Examiner's "human body" analogy as support for its conclusion that "[t]he term 'body' is simply a generic placeholder to encompass all of those various body parts." Appx6. On that basis, the Board concluded that "[i]t is not at all unreasonable for the 'body' as used in the claims, without reference to any of the other specific components of the downhole tool, to

25

be a generic term used to encompass all of the various structures included in the downhole tool other than those specifically recited." Appx6-7.

The Board reiterated that "the Examiner's interpretation of 'body' is merely that it is the overall generic term referring to the various components of the downhole tool that form the bore hole." Appx7. The Board thus agreed that "the cam sleeve is merely a part of the generic 'body' of Eddison and otherwise meets the claim limitations." Appx7.

Finally, the Board conceded that "[i]t does not appear that the Examiner would dispute that Eddison and the other references are different than the disclosed embodiments of the '817 patent" but held that "[t]he claims, however, do not recite these differences." Appx8. However, under a proper interpretation of "body," those conceded differences with the cited prior art mandate that the rejections at issue be reversed.

## V.    SUMMARY OF ARGUMENT

In this *ex parte* reexamination, the Board unreasonably construed the term "body" in the '817 patent claims as constituting an all-encompassing, generic term that includes every component of the claimed downhole tool not specifically recited in the claims.  The Board's interpretation ignores the common and ordinary meaning of "body," and is divorced from the specification, the figures, and the record evidence demonstrating the accepted understanding in the art.

The determinative issue is whether "a body" in each involved claim is a specific structural component distinct from the mandrel and the other components of the claimed downhole tool.  Under a proper BRI analysis, it is.  As established by the '817 patent's disclosure, the term "body" means only the outer housing of the tool.  It does not include the tool's mandrel or other separately-identified interior tool components.

The Board expressly agreed that "the '817 patent describes a body as a discrete element separate from other elements."  Nevertheless, the Board held that "body" could reasonably encompass three separate elements of Eddison's prior art tool—its mandrel 16, body 18, and cam sleeve 28—such that the dovetail interaction between the cam sleeve and rear face of the member/cutter in Eddison met the claimed requirement that angled surfaces of the arm engage the "body" of the

27

downhole tool. For multiple reasons, the Board's construction of "body" is wrong as a matter of law.

Under the BRI standard, a construction that is "unreasonably broad" and which does not "reasonably reflect the plain language and disclosure" of the patent will not pass muster. The Board recognized that "body" is commonly used to represent a housing, but held that no structural restrictions were imparted by the '817 specification to that term. As a result, the Board erred in treating "body" as a generic term rather than as being a specific structural component consistent with its accepted and ordinary meaning.

Neither the specification's text nor its figures provide any support for the tool's mandrel or any other component being treated as part of the tool's "body" as that term is used in the '817 patent. While the Board held that the specification did not give "body" a specific definition, there is no need for a patentee to act as his own lexicographer when using a term in accordance with its ordinary meaning. Here, the specification's text and figures consistently describe and number the "body" as a separate and distinct component from the other tool components, and nothing in the specification contradicts the clear distinction drawn between "body 510" and the other tool components.

The Board also erred in faulting the '817 patent claims for not differentiating what is and is not a body. There is no requirement that every disclosed component

be recited in the claims, and the Board disregarded the legal significance of the term "comprising" by interpreting "body" as encompassing all disclosed but unrecited components. Moreover, the '817 claims do distinguish "body" from other components like the piston and mandrel which are added by separate dependent claims. Under the doctrine of claim differentiation, a term like "body" is properly presumed to have the same meaning throughout all claims where, as here, there is no reason or basis for concluding otherwise.

The other patents of record further confirm that no one skilled in the relevant art would understand the term "body" to include a tool's mandrel or its other interior components. Indeed, Eddison itself describes and numbers its mandrel 16, body 18, and cam sleeve 28 as separate and distinct components, and further explains that its cam sleeve is attached to and serves as the face of the mandrel, not the body. Hence, Eddison's cam sleeve cannot reasonably be interpreted as part of the claimed "body" when that term is properly construed.

Finally, the '817 patent does not use "body" as a generic substitute for "member" or "element," nor as a "generic placeholder" to encompass all other tool components. Indeed, by deeming "body" to be a generic term that provides no structural specificity, it is the Board's interpretation that renders the term "body" indefinite, rather than preventing that result. Under the correct interpretation of "body," all of the Board's unpatentability rejections must be reversed.

# VI.    ARGUMENT

## A.    Standards Of Review

The Board's determination of the broadest reasonable interpretation of claim language is reviewed *de novo*.  *In re Varma*, 816 F.3d 1352, 1359 (Fed. Cir. 2016); *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1360 (Fed. Cir. 2015).  Any factual determinations regarding extrinsic evidence are reviewed for substantial evidence.  *Prolitec, Inc. v. Scentair Techs., Inc.*, 807 F.3d 1353, 1358 (Fed. Cir. 2015).

The Board's anticipation determinations are reviewed for substantial evidence.  *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014).  The Board's ultimate obviousness determinations are reviewed *de novo* while its underlying factual findings are reviewed for substantial evidence.  *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015).

"Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence."  *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)).  In reviewing the record, this Court must "take into account evidence that both justifies and detracts from the factual determinations."  *Kahn*, 441 F.3d at 985.

**B.** **The Board's Interpretation Of "Body" As A Generic, All-Encompassing Term Is Divorced From The Written Description And Is Unreasonable**

The Board interpreted "body" in the '817 patent as "a generic term used to encompass all of the various structures included in the downhole tool other than those also specifically recited." Appx7. As shown herein, that interpretation is unreasonable in light of the claims, the specification, the figures, the record, and this Court's precedent. As established by the '817 patent's disclosure, the "body" means the outer housing of the tool. It does not include the mandrel or other separately-identified interior tool components.

The Board agreed that "body" is described in the '817 specification "as a discrete element separate from other elements." Appx5. Nevertheless, the Board held that "body" in the '817 claims could reasonably be construed as a generic term imparting no structural limitations such that Eddison's separately-identified body 18, together with its mandrel 16 and cam sleeve 28, collectively met the '817 patent's "body" limitation. Because the Board's interpretation of "body" is unbounded, unsupported, and unreasonable, the Board's unpatentability rejections must be reversed.

**1.** **The BRI Standard Does Not Allow A Legally Incorrect Construction**

The Board is not at liberty to construe claims under the BRI standard "so broadly that its constructions are *unreasonable* under general claim construction

principles." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (emphasis in original).

> "[G]iving claims their broadest reasonable interpretation … does not include giving claims a legally incorrect interpretation." *In re Skvorecz*, 580 F.3d 1262, 1267 (Fed. Cir. 2009); *see also In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010) ("The broadest-construction rubric coupled with the term 'comprising' does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the claimed invention."). Rather, "claims should always be read in light of the specification and teachings in the underlying patent." *Suitco*, 603 F.3d at 1260. … Even under the broadest reasonable interpretation, the Board's construction "cannot be divorced from the specification and the record evidence," *In re NTP*, 654 F.3d 1279, 1288 (Fed. Cir. 2011), and "must be consistent with the one that those skilled in the art would reach," *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999). A construction that is "unreasonably broad" and which does not "reasonably reflect the plain language and disclosure" will not pass muster. *Suitco*, 603 F.3d at 1260.

789 F.3d at 1298. Here, as in *Microsoft*, the Board violated the above principles in rendering an "unreasonably broad" interpretation of "body" in the '817 patent.

In *Microsoft*, the claim required a gateway connected to a network and packets sent "between at least two other computers." *Id.* Another limitation recited "a caching computer connected to said gateway." *Id.* Proxyconn argued that "two other computers" referred only to a sender/computer and a receiver/computer, whereas Microsoft argued under the BRI standard that "two other computers" could be any computers on the network, including the caching computer. *Id.* The Board agreed with Microsoft, but this Court reversed. *Id.* at 1298-99.

32

First, this Court in *Microsoft* recognized that the "two other computers" limitation was recited independently from, and in addition to, the gateway and caching computers, which distinguished them from the other computers recited separately in the claims. 789 F.3d at 1299. Next, this Court explained that the specification confirmed that the "other two computers" were limited to the sender/computer and the receiver/computer because the phrase "two other computers" was consistently used to describe computers separate and distinct from the gateway and caching computers. *Id*.

Notably, this Court in *Microsoft* relied on the gateway 60, the two other computers 42 and 46, and the caching computer 62 all being given separate numbers in the specification and figures. *See* 789 F.3d at 1299 ("Read together with labeled Figure 11, this portion of the specification makes clear that the gateway, the caching computer, and the "two other computers" are each separate and distinct components of the overall system."). Thus, this Court held that "[t]he Board's construction, which expands the 'two other computers 42 and 46' to include the separately identified caching computer, is unreasonably broad in light of the language of the claims and the specification." *Id*.

This Court in *Microsoft* later held that the Board also erred in holding that the terms "sender/computer" and "receiver/computer" in other claims could encompass the gateway and caching computers.

33

> The language of the specification consistently refers to the sender/computer, receiver/computer, gateway, and caching computers as separate and independent components of an overall system. The figures of the '717 patent separately identify and number each component of the system. And nowhere does the '717 patent indicate that the gateway and caching computer are the same as, or can be subsumed within, the sender/computer and receiver/computer.

789 F.3d at 1300. For the same reasons, this Court again ruled that "the Board's construction … does not reasonably reflect the language and disclosure of the '717 patent." *Id*. Virtually the same situation makes the same reasoning directly applicable here.

As in *Microsoft*, the '817 specification consistently refers to the "body" as a separate and independent component of the overall downhole tool. The term "body" is used 34 times in the '817 specification, as either "body 510" (Appx41(8:43)) or "tool body 510" (Appx42(10:41), which even the Board conceded showed that "the '817 patent *describes* a body as a discrete element separate from the other elements." Appx5. The '817 specification's unambiguous and consistent identification of "body" as being a "separate and distinct component" of the claimed tool should have been controlling.

As in *Microsoft*, the '817 specification also consistently identifies "body 510" as distinct from other separately-identified and separately-numbered components, such as inner mandrel 560, drive ring 570, piston 530, and biasing spring 540. Appx41(8:22-38). Like the text, the accompanying figures clearly identify the

multiple other distinctly-numbered components as separate and distinct from the specific component "body 510." *See* Appx32-33(Fig. 4-5).

Finally, as in *Microsoft*, nowhere does the '817 patent indicate that the tool's mandrel or any other distinctly identified and numbered component is "the same as, or can be subsumed within," the "body" of the claimed tool. Every numbered component, including body 510, may be part of or subsumed within the generic "downhole tool 500." However, none of the other components (individually or collectively) are ever identified, described, or referenced as being part of or subsumed within the "body 510." Hence, using the langauge of *Microsoft*, the Board's "unreasonably broad" construction of "body" as a generic, all-encompassing term does not reflect "the plain language and disclosure" of the '817 patent, and cannot "pass muster" as reasonable under the BRI standard. *See* 789 F.3d at 1298 (quoting *Suitco*, 603 F.3d at 1260).

## 2. The '817 Patent Utilizes The Common Meaning Of "Body" As Being The Tool's Outer Housing

In the Final Office Action, the Examiner stated that "the claim term 'body' is … commonly used in apparatus claims to represent a housing or central/main portion of the device." Appx268. The Examiner later stated that "the structure of the body is the main cylindrical portion of the device that defines the central conduit." Appx268. Indeed, the Examiner explicitly substituted the "external housing" as a direct synonym for "body" when listing the distinct components of Eddison.

Appx269.  By failing to adopt that recognized and ordinary meaning of "body" as applicable to the '817 patent, the Examiner and the Board legally erred.

Despite identifying "the structure of the body" as being the "housing" or the "central/main portion of the device," the Examiner declared in the next sentence that "no structural restrictions are imparted by the '817 patent specification to the body." Appx268.  However, the issue is not whether the term "body" restricts the specific body configurations covered by the claims (it does not), but whether "body" by itself is a discrete and identifiable component of the claimed tool (it is).  In the latter regard, the Examiner ignored that the '817 specification establishes "body" as a specific structural component rather than merely a generic term.

By reciting "a body" without further qualification, the claims cover all manner, shapes, and sizes of tool bodies, but cover only the "body" of such tools, not their mandrels or other distinct components like pistons or cam sleeves.  *See Marsh-McBirney, Inc. v. Montedoro-Whitney Corp.*, 882 F.2d 498, 504 (Fed. Cir. 1989) (holding that claim term "a probe" covers all types of probes).  By ignoring that "body" is described and shown as being a particular structural part of the claimed tool, the Board's interpretation became completely unmoored from the ordinary meaning and the '817 specification.

The Examiner relied on "body" having "subcomponents," citing the "upper and lower connection portions."  Appx268.  The '817 specification does state that

"[t]he tool body 510 includes upper 514 and lower 512 connection portions for connecting the tool 500 into the drilling assembly." Appx41(8:1-3). But, as shown in Figures 4-5 and 11-12, such connection portions are not separate components, they are simply threaded end portions within the body by which the tool connects to the drilling assembly 100 and drilling bit 110. *See* Appx30; Appx32-33; Appx36-37. A threaded end is not a subcomponent of a structure. Moreover, the relevant concern is not whether "body" has threads or is a single component, but whether the term connotes specific structure.

Before the Board, the Examiner argued that the '817 patent does not require "body" to be "a monolithic structure" and nothing in the specification prevents "body" from being met by several components. Appx355. Smith agrees that the '817 patent does not limit "body" to a one-piece structure, but it still requires the pieces to be structure constituting the tool's outer housing. *See Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1305 (limiting "body" to a one-piece structure in light of specification), *reh'g denied*, 659 F.3d 1369 (Fed. Cir. 2011); *Walberg v. Probst*, 474 F.2d 683, 687 (CCPA 1973) (agreeing that "body" need not be a single piece, but holding that two distinct members could not be designated as one "body" or be in the same "body"). The Examiner's concern about a possible multi-piece "body" is therefore misplaced.

While the '817 specification does not preclude "body" from having multiple pieces, any such pieces collectively have to be the outer housing of the tool, not just any components within the overall tool. The specification simply does not support "body" being interpreted to include every interior component, down to and including the mandrel. Hence, the Examiner erroneously concluded that "body" in the claims is merely "a structural placeholder" that indicates that "a structure is present while allowing the structure to not be defined." Appx355-356. The Board's equally erroneous conclusion that "body" is merely "a generic placeholder" (Appx6) should also be rejected.

### 3. The "Body" Is Consistently Described In The '817 Specification And Figures As A Specific Component Of The Tool

"Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016). The Examiner explicitly agreed that "it is proper to give the term 'body' its plain meaning or ordinary and customary meaning as long as it is consistent with the specification." Appx268. The term "body" (with reference number 510) is used in the '817 specification to refer to the outer housing of tool 500 consistent with its ordinary and common meaning in the art. By refusing to accept that "body" is consistently described and used as being that specific structure, the Examiner and

the Board distorted both the '817 patent and the prior art to implement insupportable rejections.

The Examiner and the Board both viewed it as significant that "the term 'body' is not given a specific definition within the specification." Appx268; Appx5. However, the patentee had no need to act as his own lexicographer to change the accepted understanding that a "body" of a downhole tool refers to its outer housing, particularly when it was so described and illustrated in the specification's text and figures. *See Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (explaining "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner *inconsistent* with their ordinary meaning"). Where a patent uses a term consistent with its ordinary meaning in the art, there is no obligation or requirement for its specification to provide an explicit definition reciting that ordinary meaning.

Further reinforcing that the "body 510" represents a specific structural component of the claimed tool is the fact that the '817 specification and figures distinguish the body 510 from the numerous other specifically-identified and uniquely-numbered structural components of the tool. Appx32-33; Appx36-37; Appx 40-44. Apart from the upper and lower connectors (*i.e.*, threaded ends), which are structurally part of the body, nothing else is even described as being part of the

tool's body.   All other components are shown only as separate and discrete components of the overall tool 500 (or 900).

The Board's error here is like its reversible error in *In re: LF Centennial Ltd.*, 2016 WL 3545686 (Fed. Cir. June 29, 2016) (non-precedential).[2]  Applying the BRI standard in an IPR, the case turned on whether the term "spine" in claims to a television console had to be "at the center of the back" and "distinct from a leg or side panel."  *Id*. at *3.  Although Figure 1 depicted that arrangement, the Board held "that no explicit claim or specification language required importing those characteristics into the claims."  *Id*.

This Court reversed, holding "based on the ordinary-language meaning and the specification's contrast between a spine and side panels, that the Board's construction allowing the spine to be a leg or side panel of the console was unreasonably broad."  *Id*.  This Court explained that "[t]he patent figures show the spine as a piece distinct from the side panels, and assign those components different figure numbers."  *Id*.  Moreover, the specification "clearly treat[ed] the spine and side panels as separate components in saying that the spine is used 'in combination with' the side panels."  *Id*.  Finally, this Court noted that "[w]e have not found or

---

[2]  Because the decision in *Centennial* is non-precedential, it is discussed herein solely for its persuasive effect.  *See* Fed. Cir. R. 32.1(d).

been pointed to a use of the word 'spine' in the patent that contradicts or undermines the clear distinction between the components."[3]  *Id.*

The same is true here.  As in *Centennial*, the '817 patent figures show the body 510 as distinct from the mandrel, and assign those components different numbers.  Moreover, the '817 specification consistently treats and labels the body as a separate component from the piston 530, the mandrel 560, the stinger assembly 910, and the many other interior structures.  Also as in *Centennial*, there is no use of the word "body" in the specification that contradicts or undermines the clear distinction between those tool components.

Based on the ordinary-language meaning of "body" and the specification's contrast between a body and the other distinctly-described and numbered tool components, the Board's interpretation allowing "body" to encompass a mandrel and other interior tool components is unreasonably broad.  As persuasively shown in *Microsoft* and *Centennial*, the Board's construction here conflicts with the '817 specification and its figures, and should similarly be reversed.

---

[3]  *See also In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011) (construing "customer number" and "credit card number" as distinct where specification never links the two, and where the figures and other claims treated them as distinct); *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1358 (Fed. Cir. 2002) ("support wires" did not encompass all wires where specification and figures distinguished other types of wire); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns. Grp., Inc.*, 262 F.3d 1258, 1270-71 (Fed. Cir. 2001) (specification used terms "rate" and "mode" as distinct concepts).

### 4.    The Board Distorted The Specification To Interpret "Body" As Including Any Component That Defines The Tool's Flowbore

One of ordinary skill would readily recognize that a downhole tool's components will never be situated to interfere with the passage of drilling fluid through the flowbore.   Nevertheless, according to the Board, it is "perfectly reasonable to conclude, as the Examiner has done, that the term 'body,' when given its broadest reasonable construction in the claims, merely refers to the overall portion or portions of the downhole tool that define the bore and may include one or more other elements."  Appx6.  Both the Examiner and the Board are incorrect that "body" can be reasonably construed to include *everything* that defines the flowbore through the tool.

The Final Office Action stated that "[a]ccording to the '817 patent specification, the device includes a cylindrical tool body 510 which includes subcomponents, i.e. upper and lower connection portions, and a flowbore there through."  Appx268.  While not cited, the only support in the specification is a sentence stating that "[t]he expandable tool 500 comprises a generally cylindrical tool body 510 with a flowbore 508 extending therethrough."  Appx41(7:66-8:1). However, that sentence means only that tool 500 has a flowbore 508 extending therethrough, not that body 510 ***defines*** the flowbore's diameter or that any component that does not obstruct the drilling fluid is part of the body.

In the '817 patent, as in virtually all downhole tools, the mandrel is the "innermost component" of the tool whose inside circumference defines the tool's flowbore. Appx41(8:36-37). In Figures 4-5, inner mandrel 560 is inside of body 510 and is thus the component that defines the diameter of the flowbore 605. *See* Appx33. In the embodiment of Figures 11-12, "[t]he inner mandrel 560 of the first embodiment tool 500 is replaced by a stinger assembly 910," which preferably comprises three mandrel sections numbered 912, 914, and 916. Appx43(12:4-7). Notably, the specification explains that "[a]s shown in FIG. 11, fluid flows ***through the flowbore 508 of tool 900***, along pathway 605 depicted by the arrows." Appx43(12:9-12).

The above passage confirms that the flowbore goes through the overall tool, not just the body. Moreover, as shown in Figure 11, the fluid pathway 605 is along and within the flowbore defined by the inner surfaces of the three numbered inner mandrel components of stinger assembly 910. Appx36. The same pathway is depicted using the same number 605 in the embodiment of Figure 5, whose flowbore is defined by inner mandrel 560. Appx33. Thus, the '817 specification, as confirmed by its figures, teaches that the claimed tool's flowbore is defined by the mandrel component(s), not by body 510.

Because the body is the outer housing, the tool's flowbore will necessarily be inside of the body, but no tool component will obstruct the flowbore. The necessity

of having an unobstructed flowbore cannot be used as a license to construe all components of a downhole tool as being part of its body.  Yet that is what the PTO did.

Because Eddison's "mandrel 16 and body 18 collectively define a central through bore," and because cam 28 sleeve was "positioned between the mandrel 16 and body 18," the Examiner decided that was enough to allow those three components to treated as "part of the overall body that reads on the claimed body of the '817 patent."  Appx305.  Such reasoning resulted in an unbounded interpretation of "body" that includes the body and the mandrel, and every component positioned in between.  Once again, the Board's construction of "body" disregards the '817 specification and is unreasonable.

### 5. The Claims Establish That "Body" Is A Specific Component That Is Distinct From Other Identified Components

Apart from disregarding the specification, the Board's interpretation of "body" also contradicts the structure and content of the '817 patent claims.  Faulting Smith for not listing every disclosed tool component in the claims, the Board tried to justify its interpretation as follows:

> Had the Patent Owner included other specific elements in the claims to differentiate what is and is not a body *in the claims* (i.e., if the claim also included a mandrel as a separate element from the claimed body, then obviously a mandrel cannot be a body), then it would be more clear that a body is merely an element of the overall tool rather than a generic, all-encompassing term.

Appx6.  As shown below, the above rationale for the Board's interpretation is riddled with multiple reversible errors.

First, there is no requirement that every component disclosed in the specification as within the embodiments of a claimed device be expressly recited in the claims.  *See Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081, 1093 (Fed. Cir. 2003) ("[T]he claims need not recite every component necessary to enable operation of a working device.  *Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294, 1303 (Fed. Cir. 1999) (applicant need not claim every feature of a working device).").  To conclude otherwise would incorrectly mandate that all patents be limited to using "picture claims" that recite every component of an inventor's specific embodiment(s).

Second, the Board disregards the significance of the term "comprising" in the involved claims.  "[U]se of 'comprising' creates a presumption that the body of the claim is open," which means that "the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements."  *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).  For example, by stating that the claimed downhole tool "comprises" "a body" and "at least one non-pivotable, moveable arm," claim 28 allows for components in addition to a body and at least one arm, but does not require

any other components, regardless of whether additional unclaimed components are disclosed in the specification.

The Board's interpretation means that claim 28 recites arms and "a generic placeholder" that encompasses all tool components except the arms. However, the fact that the body and the arms are the only elements specified as comprising the claimed tool also cannot mean that "body" covers everything in the tool except the arms. The fact that components like a mandrel and piston are disclosed in the specification neither requires nor allows those unclaimed components to be construed as part of the "body" component that is separately and specifically recited in the claims. To do so improperly negates the legal effect of the term "comprising" in the claims.

Simply put, the term "body" in the '817 patent cannot validly be construed to encompass every other unclaimed component of the downhole tool. Yet, by the Board's own admission, that is exactly its construction. Appx7. Hence, the term "body" in the '817 patent claims cannot be reasonably construed as encompassing the mandrel, the piston, or any other disclosed component that the specification establishes is distinct from the specifically-identified "body" component that represents the tool's outer housing.

Third, the Board was wrong in concluding that the claims of the '817 patent do not differentiate the "body" from the other distinct components of the tool. As

one example, claim 1 is directed to "[a]n expandable downhole tool … comprising: a tubular body … and at least one moveable arm." Appx13. Claim 9 depends from claim 1, and recites that the tool "further includ[es] a piston." Appx14. As described in the specification and Figure 4, piston 530 is a separate structural component from body 510. Appx0041(8:29-45). If the Board were correct that "body" is a generic, all-encompassing term that includes all disclosed but unclaimed tool components, then the piston added by claim 9 would already be encompassed by the term "body" in claim 1.

More tellingly, the Board's own example of the "unclaimed mandrel" is also directly refuted by other '817 claims. In describing the second tool embodiment in Figures 11-12, the specification explains that "[t]he inner mandrel 560 of the first embodiment tool 500 is replaced by a stinger assembly 910, preferably comprising an upper inner mandrel 912, a middle inner mandrel 914, and a lower inner mandrel 916." Appx43(12:4-7). Notably, claim 17 (dependent on claim 1 through claims 13 and 15) recites "[t]he tool of claim 15 further including a stinger biased to close said ports." Appx14. Claim 18 depends from claim 17, and adds "further including an actuator for aligning said stinger." Appx14.

The "stinger" recited in claim 17 is a three-piece mandrel assembly, so a mandrel also cannot already have been encompassed by the "body" of claim 1. As the Board itself explained, "if the claim also included a mandrel as a separate element

from the claimed body, then obviously a mandrel cannot be a body." Appx6. Thus, in light of claim 17, the "body" of the '817 patent cannot properly be construed to encompass the mandrel.

Under the doctrine of claim differentiation, each claim is presumed to have a different scope, and such presumption "is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim." *Sunrace Roots Enter. Co. v. SRAM Corp*., 336 F.3d 1298, 1302-03 (Fed. Cir. 2003). Here, as in *Sunrace*, if the piston added by claim 9 or the stinger added by claim 17 were already in claim 1, those dependent claims would be entirely redundant. *Id*. at 1303.

Moreover, the term "body" is also "presumed to have the same meaning throughout all of the claims in the absence of any reason to believe otherwise." *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix*, 672 F.3d 1270, 1275 (Fed. Cir. 2012). "Where a claim term is used consistently throughout the claims, the usage of the term in one claim can often illuminate the meaning of the same term in other claims." *Am. Piledriving Equip., Inc. v. Geoquip, Inc*., 637 F.3d 1324, 1333 (Fed. Cir. 2011) (quotation omitted). In *Piledriving*, this Court observed that "[n]othing suggests that the term has different meanings in different claims." *Id*. The same is true of "body" in the '817 patent—nothing suggests that the meaning of "body" can or does vary across the claims. Hence, the Board's interpretation that

48

"body" encompasses the mandrel, the piston, and all other unclaimed components that are distinct from the tool's body cannot be correct.

### 6. The Other Patents Of Record Show That "Body" Has The Same Common And Ordinary Meaning

As reaffirmed in *Microsoft*, the BRI "must be consistent with the one that those skilled in the art would reach." 789 F.3d at 1298 (quoting *Cortright*, 165 F.3d at 1358). The Examiner declared that the "body" of a downhole tool "is not recognized as a term of art." Appx268. The Board adopted the same position. Appx5. However, like the '817 specification, the patents of record—including the cited prior art—establish that "body" is uniformly understood in the art as being a tool's outer housing.

The usage of "body" in the '817 patent as a specific tool component is entirely consistent with other patent disclosures in the art of downhole drilling tools, which uniformly reflect a clear distinction between the "body" and the "mandrel." *See, e.g.,* Appx429-445, at Appx442(4:55-57) (describing a "usual mandrel" mounted for slidable movement relative to a separate main body); Appx446-462, at Appx456-460 (describing a body and a mandrel as separate parts of a downhole tool); Appx463-474, at Appx469 (describing downhole tools having mandrels within tool bodies).

Those patents further establish that no person skilled in the relevant art would understand a tool's "body" to encompass its mandrel or other components arranged

within the interior of the tool's body.  In the Board's view, however, "the fact that these other patents label something a 'body' does not define body within the art." Appx5.  However, "[p]rior art references may be 'indicative of what those skilled in the art generally believe a certain term means … [and] can often help to determine how a disputed term is used by those skilled in the art." *Cortright*, 165 F.3d at 1358 (quoting *Vitronics*, 90 F.3d at 1584).  Notably, there is no evidence of any contrary usage of the term.

The Board stated that each "body" in the other patents "has a different structure and purpose within that specific tool."[4]  Appx5.  If that is a finding, it is unsupported by substantial evidence and thus cannot be accepted.  The Board cites no evidence of such alleged differences because there is none.  The "body" in each patent has the same purpose because each is the tool's outer housing and each is distinct from the mandrel.  Moreover, any unclaimed structural differences between what is shown as the "body" in each tool are irrelevant as long as each is the tool's outer housing.

---

[4]  With regard to Eddison, the Board stated that "[n]either the main body 60 nor the body 18 is the same as that disclosed in the '817 patent."  Appx5.  No evidence supports that statement, but if it were true, it would be another reason why there is no anticipation.  Not only are main body 60 and body 18 both serving as Eddison's outer housing, but the Board ignored that neither main body 60 nor body 18 is ever shown or described in Eddison as including its mandrel 16.

Finally, the Board cited Eddison as describing "a main body 60, while also referring to specific elements such as body 18, mandrel 16, etc." Appx5. To the extent that the Board was distinguishing Eddison's main body 60 from its body 18, Eddison's Figure 1 shows that those numbers refer to different sides of the same component. Appx403. Moreover, Eddison explains that body 60 is "main portion 60 of the body 18." Appx394. Eddison's body 18 contains two portions (top sub 50 and main portion 60) to allow removal or insertion of cam sleeve 28. Appx393-394; Appx403. Whether one piece or several, Eddison's body 18 is clearly the outer housing of Eddison's tool, and distinct from the other components, which confirms the common understanding in the art.

### 7. Eddison's Own Disclosure Establishes That Its Cam Sleeve Is Not Part Of Its Body

On its face, the Board's holding that Eddison's body 18, mandrel 16, and cam sleeve 28 together constitute the "body" of the claimed tool makes no more sense than stating that $18 + 16 + 28 = 18$. Eddison itself establishes that its body 18 alone corresponds to the "body" of the '817 patent because Eddison's mandrel and cam sleeve do not constitute the outer housing of Eddison's tool.

In addition to using "body 18" with its common and ordinary meaning, Eddison's disclosure further establishes that cam sleeve 28 is distinct from body 18. Eddison's body 18, mandrel 16, and cam sleeve 28 are each distinctly identified and numbered in its disclosure, which establishes them as separate components of

51

Eddison's tool.  *See supra* section VI.B.3.    Nevertheless, even if Eddison's labels are not controlling, Eddison describes its member/cutter as "being operatively associated with the mandrel."    Appx387(4:12); Appx388(5:19).    Because such association stems solely from the corresponding dovetails slots and profiles on the member/cutter and the cam sleeve, Eddison confirms that its cam sleeve would be grouped with its mandrel, not its body.

Eddison's independent claim 9 recites a "tool comprising:  a mandrel … [and] a body axially movably mounted on the mandrel" while dependent claim 19 adds "wherein the mandrel defines a cam surface."    Appx400-401.    Eddison's specification explains that "***the mandrel*** defines a cam surface for co-operating with an inner face of the member" and that in certain embodiments, "the faces of the mandrel and the member positively engage."    Appx390(7:7-10).    Eddison thus characterizes its cam sleeve as "defined" by the mandrel and as the face of the mandrel, but never as part of its body.  *See* Appx391(8:14-16) (tool provides "one or more members … mounted to a mandrel by dovetails").    Indeed, the cam sleeve 28 is described as being screwed into mandrel 16, but never as attached to body 18. Appx393(10:4-8).

When Eddison's mandrel and body move axially relative to each other, the movement induces radial movement of the member/cutter through its dovetail connection with the cam sleeve.  Appx386(3:12-17).  According to the Board, "[t]he

fact that a component moves relative to the other components does not make it no longer part of the overall generic body as construed by the Examiner." Appx7. This statement actually highlights the error in the Examiner's (and Board's) construction. The "overall generic" thing in the '817 patent is not the "body" but the tool 500 itself, just like the only "overall generic" thing in Eddison is the "downhole tool." *See* Appx398. Thus, Eddison confirms that its cam sleeve does not satisfy the "body" limitation of the '817 patent.

## C.    The Term "Body" In The '817 Patent Is Not A Generic, All-Encompassing Term Like "Member" Or "Element"

The Board's ultimate error is that it interpreted the absence of further limitations on the term "a body" in the '817 claims as meaning that the term by itself did not connote a particular structure. As explained, "a body" covers all tool body configurations, but covers only the bodies themselves. *See supra* section VI.B.2. By disregarding that the ordinary meaning of "body" as used in the '817 patent is a specific structural component of a downhole tool, the Board erroneously adopted a "generic, all-encompassing" interpretation that allowed it to encompass both the mandrel and the cam sleeve in Eddison's prior art tool.

The Examiner believed that if "the mandrel and cam of Eddison are prevented from reading on the claim limitation of a 'body'; limitations, not present in the claim, would be included in the claim interpretation of 'body" thereby rendering the claim indefinite." Appx269. The Board concluded "that the term 'body' as used in the

claims is essentially a generic term such as 'member' or 'element' that by itself provides no structural specificity." Appx5. However, such reasoning has it backwards—it is the Examiner's interpretation, as adopted by the Board, which renders the "body" term hopelessly indefinite.

A truly generic term such as "a member" or "an element" is never recited by itself as a claim limitation. *See, e.g.*, *Advanced Cardiovascular Sys., Inc. v. SciMed Life Systems, Inc.*, 261 F.3d 1329, 1341 (Fed. Cir. 2001) (claim terms included "connecting elements" and "connecting members"). To do so would be like using "a means" as a stand-alone limitation without an accompanying recitation of function. *Cf. Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1212-15 (Fed. Cir. 1998) (construing the terms "element," "member," and "means" as being "means-plus-function" limitations where the claims identified a required function). While using "a member" or "an element" or "a means" without any recited function or structural modifier might well be held indefinite, the recitation of "a body" by itself in the '817 patent claims does not represent such a situation because, as shown, the term "body" has "a generally understood structural meaning in the art." *See id.* at 1213. The Board acted unreasonably in not adopting that accepted meaning.

The Examiner was concerned that "[o]ne skilled in the art, reading the claims, would not be privy to the meets [*sic*] and bounds of the claimed 'body.'" Appx269. Under the ordinary and proper interpretation of "body," no such problem exists. One

skilled in the art reading the '817 patent would have immediately known that "a body" of a downhole tool is the outer housing, and understood what was not and could not be covered by the term (*e.g.*, a mandrel, a piston, a cam, etc.).  Instead, by interpreting "body" as "a generic term" that by itself "provides no structural specificity" (Appx5), it is the Board's interpretation that fails to accord any discernable metes and bounds to the term.

In practical effect, the Board construed the claims as directed to a downhole tool comprising a "nonce" word and at least one moveable arm.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015).  The Board's resulting interpretation of "a body" as a "generic placeholder" that could be "used to encompass all of the various structures included in the downhole tool" (Appx6-7) became a self-fulfilling prophecy that allowed the Board to read such limitation on whatever structure was found wherever in any prior art tool that had angled surfaces that engaged any tool component.

The same result-oriented reasoning infected the Board's mistaken reliance on the Examiner's "human body" analogy as allegedly showing that interior components are part of a body.  Appx6-7; Appx304.  Such analogy is undermined because a human body includes arms, whereas the '817 patent claims indisputably exclude the tool's arms from its body.  To support the opposite result, the Board could just as easily analogized to an automobile's body, which refers only to its outer

housing and not any interior components such as the engine, pistons, chassis, or seats.  The real point is that there is no reason to seek definitions of "body" outside the drilling tool art, where there already is an ordinary and accepted meaning of "body" that "is consistent with both the specification's teachings and the [] claim limitations." *See Trivascular*, 812 F.3d at 1062.

In *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1379 (Fed. Cir. 2006), this Court rejected an interpretation of "adjustable" that rendered the limitation "nearly meaningless" because it was "difficult, if not impossible" to imagine a device that was not "adjustable" under that construction.  Here, as confirmed by the Board's application of Eddison, the "body" limitation is likewise rendered "nearly meaningless" by the Board's interpretation of it as a generic placeholder without structural significance because it is "difficult, if not impossible" to imagine which components of a downhole tool would not be encompassed by "body" for purposes of anticipation or infringement.

The professed desire to avoid indefiniteness as justification for the Board's overbroad construction is legally incorrect and confirms that its interpretation of "body" is unreasonable.  All such "indefiniteness" problems are avoided by according "body" its ordinary and specific meaning compelled by the claims, the specification, the record evidence, and the understanding in the art.  Once "body" is

properly recognized as being the outer housing of the tool, the '817 patent claims make perfect sense.

## D.   Under The Correct Interpretation Of "Body," All Of The Challenged Rejections Should Be Reversed

Under the correct construction, Eddison's cam sleeve attached to its mandrel is not part of the claimed "body" for purposes of either anticipation or obviousness. Hence, none of the rejections at issue should be upheld.

It was only by interpreting "body" as a generic, all-encompassing term that the Board could construe that claim term as reaching the cam sleeve in Eddison's prior art tool.  Indeed, the Board conceded that it was only the "broad [] language" of the claims (as construed by the Examiner) that the Examiner could maintain the rejections over the cited art.  Appx8.  Absent that erroneous construction, even the Board recognized that "it does not appear that the Examiner would dispute that Eddison and the other references are different than the disclosed embodiments of the '817 patent."  Appx8.

"It is axiomatic that for anticipation, each and every claim limitation must be explicitly or inherently disclosed in the prior art."  *NTP*, 654 F.3d at 1302 (citations omitted).  Because the angled surfaces of the member/cutter in Eddison arguably engage only its cam sleeve, the limitation requiring the angled surfaces of the tool's arm to "engage the body" cannot be met.  Hence, the anticipation rejections of the Group I claims based on Eddison must be reversed.

Because the obviousness rejections of the Group II and Group III claims were all based on the same misinterpretation of "body" and misapplication of Eddison, they too cannot be upheld. Under the proper construction, Eddison's cam sleeve is not part of the claimed "body" such that Eddison's arm also does not "engage the body" for purposes of the "differences with the prior art" prong of the required *Graham* analysis. *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015); *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). Because that is a critical difference between the prior art and the claims which the PTO's analyses never took into account, any previous *prima facie* case of obviousness necessarily disappears.

For that reason, the obviousness rejections of the Group II and Group III claims also necessarily fall. Finally, while the correct interpretation of "body" should be dispositive of this appeal, the following additional errors affecting specific claims are also addressed below.

### 1. The Rejections Of Claims 39 and 41 Further Illustrate The PTO's Misunderstanding of Eddison

Claim 39 recites "[t]he tool of claim 28 wherein said at least one borehole engaging pad provides back reaming capability." Appx45. The '817 specification explains that "[b]ack reaming is pulling the tool 500 upwardly in the borehole while underreaming." Appx42(10:64-65).

58

Even where a tool's cutting structures are capable of cutting upwardly, the tool's arms must remain extended while the tool is pulled upward in order to do backreaming. However, the axial tension from pulling Eddison's tool upward removes the weight from its mandrel and retracts the member/cutter from an extended configuration. Appx385(2:22-25). Eddison explains that whenever the mandrel moves away from the body, the member/cutter will be "***positively withdrawn***." Appx396(13:16-21); *see* Appx396-397(13:22-14:2) (explaining if the extended member/cutter encounters a restriction during tool removal, additional tension lifts the mandrel relative to the body and the member/cutters still retract). Because Eddison's member/cutters thus retract whenever the tool is pulled upward, no backreaming is possible and claim 39 cannot be anticipated.

Similarly, claim 41 recites "[t]he tool of claim 28 wherein said at least one borehole engaging pad provides gauge protection capability." Appx45. The Examiner originally rejected claim 41 as anticipated on grounds that Eddison disclosed gauge protection allegedly because "retraction of [the] arms is in response to engagement with irregularities in the well bore." Appx100. After independent claim 28 was amended, the Examiner grouped claim 41 with the Group III claims, thus changing the grounds of rejection to obviousness in light of Eddison, Jewkes, and Wardley. *See* Appx221-222.

However, Eddison's members/cutters are fully extended during drilling, and retraction upon encountering irregularities occurs only while pulling the tool upward and only if that upward force has not already fully retracted the cutters. Appx396-397(13:16-14:2). No matter what causes the retraction, fully retracted cutters provide no gauge protection. Accordingly, the Examiner's obviousness rejection of claim 41 ignores that there could never be gauge protection in Eddison's tool due to the complete retraction of its member/cutters upon any upward movement or upon encountering a restriction. Hence, regardless of the interpretation of "body," Eddison cannot be combined to support an obviousness rejection of claim 41.

### 2. The Anticipation Rejections Of Claims 34-36 Reflect Additional Construction Errors

Dependent claim 34 recites "[t]he tool of claim 28 wherein said at least one non-pivotable, moveable arm further comprises a plurality of extensions that fit within a plurality of channels in said body." Appx16. Claim 35 is dependent upon claim 34. Appx16. Claim 36 is also dependent upon claim 34, and recites "[t]he tool of claim 34 wherein said extensions and said channels support loading on said at least one arm in said second position." Appx17.

Regardless of how "body" is construed, the anticipation rejections of claims 34-36 based on Eddison separately fail. First, the term "plurality" in a patent claim means "two or more." *See Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327-28 (Fed. Cir. 2001). Even if Edisson's cam sleeve met the "body"

limitation, the cam and member/cutters in Eddison do not have a "plurality" of extensions and channels because the dovetail configuration constitutes only one extension and corresponding channel. Moreover, the dovetail configuration is designed to slide in response to vertical or axial loading, so it cannot support any loading on the arm as additionally required by claim 36.

### 3.    The Anticipation Rejections Of Claims 93-100 Also Reflect Additional Construction Errors

As added during reexamination, independent claim 93 does not recite "a body" without more, but instead requires "a body defining an outermost diameter of the expandable downhole tool when the tool is in a retracted configuration." Appx25. Thus, the "body" limitation of claim 93 cannot include interior components such as the mandrel which cannot possibly define any aspect of the outermost diameter of the tool.

Claim 93 also requires at least one arm "having at least one surface that engages the body." Appx25. However, the Board specifically relied on it being "clear from the Examiner's rejection … that engagement with the body as recited in claims 28 and 93 is met by the cutter arms engagement with the cam sleeve, which is part of the body as construed by the Examiner." Appx7. Because Eddison's cam sleeve is not the "body," the rejection of claims 93-100 should also be reversed on that basis.

Finally, dependent claim 96 recites "[t]he tool of claim 93 further comprising at least two angled surfaces on each of at least two opposite sides of the arm." Appx26.  As illustrated at Appx308, the Examiner relied on the two sides of the dovetail slot 42 on arm 30 in Eddison as meeting that added limitation.  Appx307-308.  The Board held that "[t]he fact that the opposing sides as interpreted by the Examiner are both on the backside/dovetail of the cutting arm does not take them outside the language of the claims" because the Examiner "clearly pointed to two opposing sides that are angled surfaces that meet the claim language."  Appx8.

Like the Examiner, the Board ignored that claim 96 also requires that there be at least *two* such angled surfaces *on each* opposing side of the arm.  Appx26.  As shown in the Examiner's own illustration (Appx308), the dovetail slot 42 in Eddison contains only one angled surface on each side of the arm, even under the Examiner's interpretation.  Hence, claim 96 cannot be anticipated for that independent reason.

## VII.  CONCLUSION

For the reasons stated, the Board's unpatentability rulings should be reversed.


Dated:  October 24, 2016                    Respectfully submitted,


                                            /s/ John R. Keville
                                            John R. Keville
                                            WINSTON & STRAWN LLP
                                            1111 Louisiana Street, 25th Floor
                                            Houston, TX  77002
                                            (713) 651-2600

Tyler T. VanHoutan
WINSTON & STRAWN LLP
1111 Louisiana Street, 25th Floor
Houston, TX  77002
(713) 651-2600

Richard L. Stanley
P.O. Box 7967
Houston, Texas 77270
(832) 656-4277

*Attorneys for Smith International, Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    This brief contains <u>13,788</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.


Dated:  October 24, 2016                    /s/ John R. Keville
                                            John R. Keville

# ADDENDUM

## **Table of Contents**

| **Tab** | **Description** | **Pages** |
|---------|-----------------|-----------|
| 1 | Board's Final Decision issued on April 29, 2016 | Appx1-9 |
| 2 | U.S. Patent No. 6,732,817 | Appx29-46 |

# TAB 1



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,912 | 07/03/2013 | 6,732,817 B2 | 170037-4500 | 9916 |

28765     7590     04/29/2016
WINSTON & STRAWN LLP
PATENT DEPARTMENT
1700 K STREET, N.W.
WASHINGTON, DC 20006

| EXAMINER |
|---|
| WILLIAMS, CATHERINE SERKE |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/29/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* SMITH INTERNATIONAL, INC.,
J. JEFFREY GUNN, and TRASKBRITT, P.C.[1]

_____

Appeal 2015-008323
Reexamination Control 90/012,912
Patent US 6,732,817 B2[2]
Technology Center 3900

_____


Before DANIEL S. SONG, MICHAEL L. HOELTER, and
BRETT C. MARTIN, *Administrative Patent Judges*.

MARTIN, *Administrative Patent Judge*.


DECISION ON APPEAL

_____

[1] Smith International, Inc. is the real party in interest.  App. Br. 2.
[2] Issued to Dewey et al. on May 11, 2004 (hereinafter the '817 patent).

Appeal 2015-008323
Reexamination Control 90/012,912
Patent US 6,732,817 B2

## STATEMENT OF THE CASE

The Patent Owner appeals under 35 U.S.C. §§ 134(b) and 306 from the Examiner's final rejection of claims 28–36, 39–46, 50, 79–81, and 93–99, which are the only claims subject to this appeal, of which claims 28, 43, and 93 are the independent claims. We have jurisdiction under 35 U.S.C. §§ 134(b) and 306.

We are informed that the '817 patent is involved in pending litigation styled *Schlumberger Technology Corp., Smith International, Inc. and Specialised Petroleum Services Group, Ltd. v. Baker Hughes Inc.,* Case No. 4:12-cv-3573 in the Southern District of Texas. App. Br. 2.

We AFFIRM.

## THE INVENTION

The Patent Owner's invention is directed generally to "underreamers used for enlarging a borehole below a restriction to result in a borehole that is larger than the restriction." Spec. col. 1, ll. 16–18. Claim 28, reproduced below, is illustrative of the claimed subject matter:

> 28. An expandable downhole tool for use in a drilling assembly positioned within a wellbore having an original diameter borehole and an enlarged diameter borehole, comprising: a body; and at least one non-pivotable, moveable arm having at least one borehole engaging pad adapted to accommodate cutting structures or wear structures or a combination thereof *and having angled surfaces that engage said body to prevent said arm from vibrating in said second position;* wherein said at least one arm is moveable between a first position defining a collapsed diameter, and a second position defining an expanded diameter approximately equal to said enlarged diameter borehole.

2

Appeal 2015-008323
Reexamination Control 90/012,912
Patent US 6,732,817 B2

## REFERENCES

The prior art relied upon by the Examiner in rejecting the claims on

appeal is:

| Jewkes | US 6,059,051 | May 9, 2000 |
| Eddison | WO 00/31371 | June 2, 2000 |
| Wardley | EP 0 246 789 | Nov. 25, 1987 |

## THE REJECTIONS ON APPEAL

The Examiner made the following rejections:

1.      Claims 28–36, 39, 40, 42, 79, 80, and 93–98 stand rejected
under 35 U.S.C §102(b) as being anticipated by Eddison.  Ans. 2.

2.      Claims 43–46 and 49 stand rejected under 35 U.S.C §103(a) as
being unpatentable over Eddison and Jewkes.  Ans. 6.

3.      Claims 28, 40, 41, 43, 50, 80, 81, 93, and 99 stand rejected
under 35 U.S.C §103(a) as being unpatentable over Eddison, Wardley, and
Jewkes.  Ans. 9.

## ANALYSIS

According to the Patent Owner, the Examiner's rejections, all of
which rely upon Eddison as the sole or base reference, are improper because
they use an incorrect construction of the term "body" as used in the claims.
App. Br. 12.  The Patent Owner provides two main arguments against the
Examiner's construction:  1) that it "overlooks the fact that a downhole
tool's 'body' is distinct from other parts of the downhole tool" and 2) that it
"overlooks the understanding of a person of skill in the art as evidenced by
various references of record as to the meaning of the term 'body' in the
relevant field."  App. Br. 13–14.

3

Appeal 2015-008323
Reexamination Control 90/012,912
Patent US 6,732,817 B2

As to the first argument, the Patent Owner appears merely to argue that its nomenclature should control because it describes in the patent an item called a "body," whereas other components, such as a "mandrel," have different names and are distinct elements. App. Br. 14. While it may be true that the '817 patent *describes* a body as a discrete element separate from other elements when discussing various embodiments, such does not in and of itself proscribe the Examiner's construction. Nor has the Patent Owner acted as its own lexicographer and *defined* the term "body" so as to preclude the Examiner's interpretation. We agree with the Examiner that the term "body" as used in the claims is essentially a generic term such as "member" or "element" that by itself provides no structural specificity. *See* Ans. 14.

As to the Patent Owner's argument regarding how those of skill in the art would understand "body," the only evidence provided is that other patents also sometimes describe a "body" as a discrete element as compared to other elements not called a body. *See* App. Br. 19–20. Similar to the Patent Owner's own Specification, the fact that these other patents label something a "body" does not define body within the art. Further, the Patent Owner has not shown that the parts identified in the prior art as bodies are so similar as to create a specific identity of what a body is. Each of the elements in the prior art identified as a "body" by the Patent Owner has a different structure and purpose within that specific tool. For example, we note that Eddison describes a main body 60, while also referring to specific elements such as body 18, mandrel 16, etc. *See* Eddison p. 11, ll. 15–18 and p. 12, l. 10. Neither the main body 60 nor the body 18 is the same as that disclosed in the '817 patent. It would appear from the various descriptions

4

Appeal 2015-008323
Reexamination Control 90/012,912
Patent US 6,732,817 B2

that there can be various elements referred to as a "body" and that something can also be a "main body," which is akin to the Examiner's broad, but reasonable construction of the term.

The Patent Owner also takes issue with the Examiner noting that the Patent Owner has not included other elements such as a mandrel or cam or other such elements in the claim and asserts that "the fact that the disclosed mandrel is unclaimed [does not] have any bearing on the proper construction of the term 'body.'" Reply Br. 12. The Patent Owner misses the point of the Examiner's statement. Had the Patent Owner included other specific elements in the claims to differentiate what is and is not a body *in the claims* (i.e., if the claim also included a mandrel as a separate element from the claimed body, then obviously a mandrel cannot be a body), then it would be more clear that a body is merely an element of the overall tool rather than a generic, all-encompassing term. The claims, however, essentially recite only a body and the movable cutting arms, such that it is perfectly reasonable to conclude, as the Examiner has done, that the term "body," when given its broadest reasonable construction in the claims, merely refers to the overall portion or portions of the downhole tool that define the bore and may include one or more other elements.

We also disagree with the Patent Owner that the Examiner abandoned the apt analogy of a human body, simply because it was not restated in the Answer. *See* Reply Br. 7. As the Examiner previously stated, a human body includes arms, legs, and many other components that are simply part of the body. *See* Advisory Action 2. The term "body" is simply a generic placeholder to encompass all of those various body parts. It is not at all

5

Appeal 2015-008323
Reexamination Control 90/012,912
Patent US 6,732,817 B2

unreasonable for the "body" as used in the claims, without reference to any
of the other specific components of the downhole tool, to be a generic term
used to encompass all of the various structures included in the downhole tool
other than those also specifically recited. Accordingly, we see no error in
the Examiner's broad, but reasonable construction.

The Patent Owner next asserts that, even if the Examiner's
construction were proper, Eddison still does not anticipate because the
Examiner has stated that the body is a housing and that the cam sleeve of
Eddison is not a housing. Again, the Examiner's interpretation of "body" is
merely that it is the overall generic term referring to the various components
of the downhole tool that form the bore hole as discussed *supra*. The
Examiner clearly states that the cam sleeve is merely a part of the generic
"body" of Eddison and otherwise meets the claim limitations: "the cam
works in conjunction with the other components structurally and
functionally as the body of the '817 patent." Ans. 15. Nor does it matter
that the cam sleeve may move within Eddison's tool. The fact that a
component moves relative to other components does not make it no longer
part of the overall generic body as construed by the Examiner.

The Patent Owner purports to separately argue claims 93–99, but this
argument only partially addresses the Examiner's rejection. App. Br. 27–28.
The Patent Owner focuses only on the Examiner's description of Eddison's
port 32 as providing the "surface that engages the body." *Id.* It is clear from
the Examiner's rejection, however that engagement with the body as recited
in claims 28 and 93 is met by the cutter arms engagement with the cam
sleeve, which is part of the body as construed by the Examiner. Ans. 3–4.

6

Appeal 2015-008323
Reexamination Control 90/012,912
Patent US 6,732,817 B2

The Examiner's reference to the port 32 is merely further to point out how the claimed guiding in claim 93 is accomplished.  *Id.*

As to claim 96, we find no error in the Examiner's interpretation.  The Patent Owner's reproduction of the Examiner's marked-up version of Figure 6 clearly shows how the Examiner is interpreting "opposite sides."  *See* App. Br. 29.  The fact that the opposing sides as interpreted by the Examiner are both on the backside/dovetail of the cutting arm does not take them outside the language of the claims.  The Examiner has clearly pointed to two opposing sides that are angled surfaces that meet the claim language at issue.

In general, the Patent Owner argues in this case for a narrower construction of various claim terms than the claims actually require.  It does not appear that the Examiner would dispute that Eddison and the other references are different than the disclosed embodiments of the '817 patent. The claims, however, do not recite these differences and the broad claim language used therein allows the Examiner to maintain proper rejections of the claims over the cited art.  It appears that the Examiner has provided a path to overcome the rejections at issue, but rather than adjust the claims accordingly, the Patent Owner has merely argued for narrower constructions. Because we conclude that the Examiner's constructions are not unreasonably broad, we are not persuaded of any error in the Examiner's anticipation rejections.

Regarding the remaining combinations of references with Eddison, the Patent Owner relies on the arguments provided with respect to the alleged deficiencies in Eddison and the Examiner's claim constructions but does not argue that the combinations are improper.  Accordingly, for the

7

Appeal 2015-008323
Reexamination Control 90/012,912
Patent US 6,732,817 B2

reasons stated above, we sustain the Examiner's obviousness rejections as well.

## DECISION

For the above reasons, we AFFIRM the Examiner's decision to reject claims 28–36, 39–46, 50, 79–81, and 93–99.

Requests for extensions of time in this *ex parte* reexamination proceeding are governed by 37 C.F.R. § 1.550(c).  *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

8

**TAB 2**



US006732817B2

(12) **United States Patent**
Dewey et al.

(10) **Patent No.:**    **US 6,732,817 B2**
(45) **Date of Patent:**        **May 11, 2004**

(54) **EXPANDABLE UNDERREAMER/ STABILIZER**

(75) Inventors: **Charles H. Dewey**, Houston, TX (US); **Wei Xu**, Houston, TX (US)

(73) Assignee: **Smith International, Inc.**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 30 days.

(21) Appl. No.: **10/078,067**

(22) Filed: **Feb. 19, 2002**

(65) **Prior Publication Data**

US 2003/0155155 A1 Aug. 21, 2003

(51) Int. Cl.[7] .............................................. **E21B 7/28**

(52) U.S. Cl. ......................... **175/57;** 175/267; 175/291; 175/406

(58) Field of Search ......................... 175/57, 263, 266, 175/267, 269, 291, 344, 385, 391, 406

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,224,507 A | 12/1965 | Cordary et al. | 166/55.8 |
| 3,425,500 A | 2/1969 | Fuchs | 175/269 |
| 4,055,226 A | 10/1977 | Weber | 175/273 |
| 4,660,657 A | 4/1987 | Furse et al. | 175/269 |
| 4,848,490 A | 7/1989 | Anderson | 175/323 |
| 5,318,137 A | 6/1994 | Johnson et al. | 175/40 |
| 5,318,138 A | 6/1994 | Dewey et al. | 175/74 |
| 5,332,048 A | 7/1994 | Underwood et al. | 175/26 |
| 5,368,114 A | 11/1994 | Tandberg et al. | 175/267 |
| 5,765,653 A | 6/1998 | Doster et al. | 175/75 |
| 6,039,131 A | 3/2000 | Beaton | 175/376 |
| 6,213,226 B1 | 4/2001 | Eppink et al. | 175/61 |
| 6,227,312 B1 | 5/2001 | Eppink et al. | 175/57 |
| 6,269,893 B1 | 8/2001 | Beaton et al. | 175/391 |
| 6,289,999 B1 | 9/2001 | Dewey et al. | 175/38 |
| 6,378,632 B1 * | 4/2002 | Dewey et al. | 175/269 |
| 6,494,272 B1 * | 12/2002 | Eppink et al. | 175/57 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 301 890 | 2/1989 | .......... E21B/10/32 |
| EP | 0 594 420 A1 | 4/1994 | .......... E21B/17/10 |

OTHER PUBLICATIONS

British Search Report dated 9 Jun. 2003; for Appln. No. GB 0302983.2; (3 p.)

* cited by examiner

*Primary Examiner*—Zakiya Walker
(74) *Attorney, Agent, or Firm*—Conley Rose, P.C.

(57) **ABSTRACT**

A downhole tool that functions as an underreamer, or alternatively, as a stabilizer in an underreamed borehole. The tool includes one or more moveable arms disposed within a body having a flowbore therethrough in fluid communication with the wellbore annulus. The tool alternates between collapsed and expanded positions in response to differential fluid pressure between the flowbore and the wellbore annulus. In one embodiment, the tool moves automatically in response to differential pressure. In a second embodiment, the tool must be selectively actuated before it is moveable. When the tool expands, the arms are preferably translated axially upwardly, while simultaneously being extended radially outwardly from the body. The expanded tool diameter is adjustable at the surface without changing components. The arms may include borehole engaging pads that comprise cutting structures or wear structures or both, depending upon the function of the tool.

**73 Claims, 8 Drawing Sheets**





Fig. 2



Fig. 1



Fig. 6



Fig. 3

Fig. 4





Fig. 5

514
500
555
508
554
550
516
540
552
542
544
520
522
800
516
524
22
526
700
620
575
570
530
560
516
535
610
535
590
610
605
605
595
580
510
512



Fig. 7

Fig. 8

Fig. 9



Fig. 10





Fig. 11



Fig. 12

US 6,732,817 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# EXPANDABLE UNDERREAMER/STABILIZER

## CROSS-REFERENCE TO RELATED APPLICATIONS

Not Applicable.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not Applicable.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to underreamers used for enlarging a borehole below a restriction to result in a borehole that is larger than the restriction. The present invention also relates generally to stabilizers used for controlling the trajectory of a drill bit during the drilling process. More particularly, the present invention relates to an expandable tool that may function as an underreamer, or alternatively, may function as a stabilizer in an underreamed portion of borehole. Still more particularly, the present invention relates to an expandable tool having arms that expand when a piston is exposed to fluid circulating through the borehole.

### 2. Description of the Related Art

In the drilling of oil and gas wells, concentric casing strings are installed and cemented in the borehole as drilling progresses to increasing depths. Each new casing string is supported within the previously installed casing string, thereby limiting the annular area available for the cementing operation. Further, as successively smaller diameter casing strings are suspended, the flow area for the production of oil and gas is reduced. Therefore, to increase the annular space for the cementing operation, and to increase the production flow area, it is often desirable to enlarge the borehole below the terminal end of the previously cased borehole. By enlarging the borehole, a larger annular area is provided for subsequently installing and cementing a larger casing string than would have been possible otherwise. Accordingly, by enlarging the borehole below the previously cased borehole, the bottom of the formation can be reached with comparatively larger diameter casing, thereby providing more flow area for the production of oil and gas.

Various methods have been devised for passing a drilling assembly through an existing cased borehole and enlarging the borehole below the casing. One such method is the use of an underreamer, which has basically two operative states—a closed or collapsed state, where the diameter of the tool is sufficiently small to allow the tool to pass through the existing cased borehole, and an open or partly expanded state, where one or more arms with cutters on the ends thereof extend from the body of the tool. In this latter position, the underreamer enlarges the borehole diameter as the tool is rotated and lowered in the borehole.

A "drilling type" underreamer is typically used in conjunction with a conventional pilot drill bit positioned below or downstream of the underreamer. The pilot bit can drill the borehole at the same time as the underreamer enlarges the borehole formed by the bit. Underreamers of this type usually have hinged arms with roller cone cutters attached thereto. Most of the prior art underreamers utilize swing out cutter arms that are pivoted at an end opposite the cutting end of the cutting arms, and the cutter arms are actuated by mechanical or hydraulic forces acting on the arms to extend or retract them. Typical examples of these types of underreamers are found in U.S. Pat. Nos. 3,224,507; 3,425,500 and 4,055,226. In some designs, these pivoted arms tend to break during the drilling operation and must be removed or "fished" out of the borehole before the drilling operation can continue. The traditional underreamer tool typically has rotary cutter pocket recesses formed in the body for storing the retracted arms and roller cone cutters when the tool is in a closed state. The pocket recesses form large cavities in the underreamer body, which requires the removal of the structural metal forming the body, thereby compromising the strength and the hydraulic capacity of the underreamer. Accordingly, these prior art underreamers may not be capable of underreaming harder rock formations, or may have unacceptably slow rates of penetration, and they are not optimized for the high fluid flow rates required. The pocket recesses also tend to fill with debris from the drilling operation, which hinders collapsing of the arms. If the arms do not fully collapse, the drill string may easily hang up in the borehole when an attempt is made to remove the string from the borehole.

Conventional underreamers have several disadvantages, including cutting structures that are typically formed of sections of drill bits rather than being specifically designed for the underreaming function. Therefore, the cutting structures of most underreamers do not reliably underream the borehole to the desired diameter. A further disadvantage is that adjusting the expanded diameter of a conventional underreamer requires replacement of the cutting arms with larger or smaller arms, or replacement of other components of the underreamer tool. It may even be necessary to replace the underreamer altogether with one that provides a different expanded diameter. Another disadvantage is that many underreamers are designed to automatically expand when drilling fluid is pumped through the drill string, and no indication is provided at the surface that the underreamer is in the fully-expanded position. In some applications, it may be desirable for the operator to control when the underreamer expands.

Accordingly, it would be advantageous to provide an underreamer that is stronger than prior art underreamers, with a hydraulic capacity that is optimized for the high flowrate drilling environment. It would further be advantageous for such an underreamer to include several design features, namely cutting structures designed for the underreaming function, mechanisms for adjustment of the expanded diameter without requiring component changes, and the ability to provide indication at the surface when the underreamer is in the fully-expanded position. Moreover, in the presence of hydraulic pressure in the drill string, it would be advantageous to provide an underreamer that is selectively expandable.

Another method for enlarging a borehole below a previously cased borehole section includes using a winged reamer behind a conventional drill bit. In such an assembly, a conventional pilot drill bit is disposed at the lowermost end of the drilling assembly with a winged reamer disposed at some distance behind the drill bit. The winged reamer generally comprises a tubular body with one or more longitudinally extending "wings" or blades projecting radially outwardly from the tubular body. Once the winged reamer has passed through any cased portions of the wellbore, the pilot bit rotates about the centerline of the drilling axis to drill a lower borehole on center in the desired trajectory of the well path, while the eccentric winged reamer follows the pilot bit and engages the formation to enlarge the pilot borehole to the desired diameter.

US 6,732,817 B2

3

Yet another method for enlarging a borehole below a previously cased borehole section includes using a bi-center bit, which is a one-piece drilling structure that provides a combination underreamer and pilot bit. The pilot bit is disposed on the lowermost end of the drilling assembly, and the eccentric underreamer bit is disposed slightly above the pilot bit. Once the bi-center bit has passed through any cased portions of the wellbore, the pilot bit rotates about the centerline of the drilling axis and drills a pilot borehole on center in the desired trajectory of the well path, while the eccentric underreamer bit follows the pilot bit and engages the formation to enlarge the pilot borehole to the desired diameter. The diameter of the pilot bit is made as large as possible for stability while still being capable of passing through the cased borehole. Examples of bi-center bits may be found in U.S. Pat. Nos. 6,039,131 and 6,269,893.

As described above, winged reamers and bi-center bits each include underreamer portions that are eccentric. A number of disadvantages are associated with this design. First, before drilling can continue, cement and float equipment at the bottom of the lowermost casing string must be drilled out. However, the pass-through diameter of the drilling assembly at the eccentric underreamer portion barely fits within the lowermost casing string. Therefore, off-center drilling is required to drill out the cement and float equipment to ensure that the eccentric underreamer portions do not damage the casing. Accordingly, it is desirable to provide an underreamer that collapses while the drilling assembly is in the casing and that expands to underream the previously drilled borehole to the desired diameter below the casing.

Further, due to directional tendency problems, these eccentric underreamer portions have difficulty reliably underreaming the borehole to the desired diameter. With respect to a bi-center bit, the eccentric underreamer bit tends to cause the pilot bit to wobble and undesirably deviate off center, thereby pushing the pilot bit away from the preferred trajectory of drilling the well path. A similar problem is experienced with respect to winged reamers, which only underream the borehole to the desired diameter if the pilot bit remains centralized in the borehole during drilling. Accordingly, it is desirable to provide an underreamer that remains concentrically disposed in the borehole while underreaming the previously drilled borehole to the desired diameter.

In drilling operations, it is conventional to employ a tool known as a "stabilizer." In standard boreholes, traditional stabilizers are located in the drilling assembly behind the drill bit for controlling the trajectory of the drill bit as drilling progresses. Traditional stabilizers control drilling in a desired direction, whether the direction is along a straight borehole or a deviated borehole.

In a conventional rotary drilling assembly, a drill bit may be mounted onto a lower stabilizer, which is disposed approximately 5 feet above the bit. Typically the lower stabilizer is a fixed blade stabilizer that includes a plurality of concentric blades extending radially outwardly and spaced azimuthally around the circumference of the stabilizer housing. The outer edges of the blades are adapted to contact the wall of the existing cased borehole, thereby defining the maximum stabilizer diameter that will pass through the casing. A plurality of drill collars extends between the lower stabilizer and other stabilizers in the drilling assembly. An upper stabilizer is typically positioned in the drill string approximately 30–60 feet above the lower stabilizer. There could also be additional stabilizers above the upper stabilizer. The upper stabilizer may be either a

4

fixed blade stabilizer or, more recently, an adjustable blade stabilizer that allows the blades to be collapsed into the housing as the drilling assembly passes through the casing and then expanded in the borehole below. One type of adjustable concentric stabilizer is manufactured by Andergauge U.S.A., Inc., Spring, Tex. and is described in U.S. Pat. No. 4,848,490. Another type of adjustable concentric stabilizer is manufactured by Halliburton, Houston, Tex. and is described in U.S. Pat. Nos. 5,318,137; 5,318,138; and 5,332,048.

In operation, if only the lower stabilizer was provided, a "fulcrum" type assembly would be present because the lower stabilizer acts as a fulcrum or pivot point for the bit. Namely, as drilling progresses in a deviated borehole, for example, the weight of the drill collars behind the lower stabilizer forces the stabilizer to push against the lower side of the borehole, thereby creating a fulcrum or pivot point for the drill bit. Accordingly, the drill bit tends to be lifted upwardly at an angle, i.e. build angle. Therefore, a second stabilizer is provided to offset the fulcrum effect. Namely, as the drill bit builds angle due to the fulcrum effect created by the lower stabilizer, the upper stabilizer engages the lower side of the borehole, thereby causing the longitudinal axis of the bit to pivot downwardly so as to drop angle. A radial change of the blades of the upper stabilizer can control the pivoting of the bit on the lower stabilizer, thereby providing a two-dimensional, gravity based steerable system to control the build or drop angle of the drilled borehole as desired.

When an underreamer or a winged reamer tool is operating behind a conventional bit to underream the borehole, that tool provides the same fulcrum effect to the bit as the lower stabilizer in a standard borehole. Similarly, when underreaming a borehole with a bi-center bit, the eccentric underreamer bit provides the same fulcrum effect as the lower stabilizer in a standard borehole. Accordingly, in a drilling assembly employing an underreamer, winged reamer, or a bi-center bit, a lower stabilizer is not typically provided. However, to offset the fulcrum effect imparted by to the drill bit, it would be advantageous to provide an upper stabilizer capable of controlling the inclination of the drilling assembly in the underreamed section of borehole.

In particular, it would be advantageous to provide an upper stabilizer that engages the wall of the underreamed borehole to keep the centerline of the pilot bore centered within the borehole. When utilized with an eccentric underreamer that tends to force the pilot bit off center, the stabilizer blades would preferably engage the opposite side of the expanded borehole to counter that force and keep the pilot bit on center.

BRIEF SUMMARY OF THE PREFERRED EMBODIMENTS

The preferred embodiments of the present invention feature a downhole expandable tool that may be used as an underreamer to enlarge the diameter of a borehole below a restriction, or alternatively, may be used as a stabilizer to control the directional tendencies of a drilling assembly in an underreamed borehole.

In one preferred embodiment, the expandable tool comprises a body with a flowbore therethrough in fluid communication with the wellbore annulus. The tool alternates between a collapsed position and an expanded position in response to differential fluid pressure. More specifically, the tool is biased to a collapsed position and expands in response to differential fluid pressure between the flowbore and the wellbore annulus. In the expanded position, the flow area

5

between the flowbore and the wellbore annulus is larger than when the tool is in the collapsed position. The tool may expand automatically in response to differential fluid pressure, or may be constructed so that it must be selectively actuated before it will expand in response to the differential fluid pressure.

In one preferred embodiment, the expandable tool further includes at least one axial recess in the body and at least one moveable arm. The number of recesses corresponds to the number of moveable arms, such that each arm is stored in a corresponding recess when the tool is collapsed. Preferably the tool includes three such arms that are biased to a collapsed position by a spring. When the tool expands, the arms are translated axially upwardly, while simultaneously being extended radially outwardly from the body. Preferably, the arms are moved upwardly by a piston and extended outwardly along angled channels in the body. The expanded diameter of the tool is adjustable at the surface without requiring a change of components.

The arms include borehole engaging pads that comprise cutting structures or wear structures or both, depending upon whether the tool will be used for both back reaming and underreaming, underreaming only, stabilizing only, or both underreaming and stabilizing. The expandable tool further includes moveable nozzles designed to continuously direct cooling and cleaning fluid to cutting structures on the arms.

Thus, the present invention comprises a combination of features and advantages that enable it to overcome various problems of prior devices. The various characteristics described above, as well as other features, will be readily apparent to those skilled in the art upon reading the following detailed description of the preferred embodiments of the invention, and by referring to the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more detailed description of the preferred embodiment of the present invention, reference will now be made to the accompanying drawings, wherein:

FIG. 1 is a schematic, cross-sectional view of an exemplary drilling assembly that employs one embodiment of the invention and that includes a conventional drill bit drilling a borehole within a formation, an underreamer enlarging the borehole above the bit, and a stabilizer above the underreamer controlling the directional tendencies of the drilling assembly in the underreamed borehole;

FIG. 2 is a schematic, cross-sectional view of another exemplary drilling assembly that employs one embodiment of the invention and that includes a conventional drill bit drilling a borehole within a formation, a winged reamer enlarging the borehole above the bit, and a stabilizer above the winged reamer controlling the directional tendencies of the drilling assembly in the underreamed borehole;

FIG. 3 is a schematic, cross-sectional view of still another exemplary drilling assembly that employs one embodiment of the invention and that includes a bi-center bit drilling and enlarging a borehole within a formation, and a stabilizer above the bi-center bit controlling the directional tendencies of the drilling assembly in the underreamed borehole;

FIG. 4 is a cross-sectional elevation view of one embodiment of the expandable tool of the present invention, showing the moveable arms in the collapsed position;

FIG. 5 is a cross-sectional elevation view of the expandable tool of FIG. 4, showing the moveable arms in the expanded position;

FIG. 6 is a perspective view of a "blank" arm for the expandable tool of FIG. 4;

6

FIG. 7 is a top view of an exemplary arm for the expandable tool of FIG. 4 including a wear pad and cutting structures for back reaming and underreaming;

FIG. 8 is a side elevation view of the arm of FIG. 7;

FIG. 9 is a perspective view of the arm of FIG. 7;

FIG. 10 is a perspective view of the drive ring of the expandable tool of FIG. 4;

FIG. 11 is a cross-sectional elevation view of an alternative embodiment of the expandable tool of the present invention, showing the moveable arms in the collapsed position; and

FIG. 12 is a cross-sectional elevation view of the alternative embodiment of FIG. 11, showing the moveable arms in the expanded position.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

The present invention relates to methods and apparatus for underreaming to enlarge a borehole below a restriction, such as casing. Alternatively, the present invention relates to methods and apparatus for stabilizing a drilling assembly and thereby controlling the directional tendencies of the drilling assembly within an enlarged borehole. The present invention is susceptible to embodiments of different forms. There are shown in the drawings, and herein will be described in detail, specific embodiments of the present invention with the understanding that the disclosure is to be considered as an exemplification of the principles of the invention, and is not intended to limit the invention to that illustrated and described herein.

In particular, various embodiments of the present invention provide a number of different constructions and methods of operation. Each of the various embodiments of the present invention may be used to enlarge a borehole, or to provide stabilization in a previously enlarged borehole, or in a borehole that is simultaneously being enlarged. The preferred embodiments of the expandable tool of the present invention may be utilized as an underreamer, or as a stabilizer behind a bi-center bit, or as a stabilizer behind a winged reamer or underreamer following a conventional bit. The embodiments of the present invention also provide a plurality of methods for use in a drilling assembly. It is to be fully recognized that the different teachings of the embodiments disclosed herein may be employed separately or in any suitable combination to produce desired results.

It should be appreciated that the expandable tool described with respect to the Figures that follow may be used in many different drilling assemblies. The following exemplary systems provide only some of the representative assemblies within which the present invention may be used, but these should not be considered the only assemblies. In particular, the preferred embodiments of the expandable tool of the present invention may be used in any assembly requiring an expandable underreamer and/or stabilizer for use in controlling the directional tendencies of a drilling assembly in an expanded borehole.

FIGS. 1–3 show various exemplary drilling assemblies within which the preferred embodiments of the present invention may be utilized. Referring initially to FIG. 1, a section of a drilling assembly generally designated as 100 is shown drilling into the bottom of a formation 10 with a conventional drill bit 110 followed by an underreamer 120. Separated from the underreamer 120 by one or more drill collars 130 is a stabilizer 150 that controls the directional tendencies of the drilling assembly 100 in the underreamed

US 6,732,817 B2

7

borehole **25**. This section of the drilling assembly **100** is shown at the bottom of formation **10** drilling a borehole **20** with the conventional drill bit **110**, while the underreamer cutting arms **125** are simultaneously opening a larger diameter borehole **25** above. The drilling assembly **100** is operating below any cased portions of the well.

As described previously, the underreamer **120** tends to provide a fulcrum or pivot effect to the drill bit **110**, thereby requiring a stabilizer **150** to offset this effect. In the preferred embodiment of the drilling assembly **100**, various embodiments of the expandable tool of the present invention are provided in the positions of both the underreamer **120** and the stabilizer **150**. In the most preferred embodiment, the stabilizer **150** would also preferably include cutting structures to ensure that the larger borehole **25** is enlarged to the proper diameter. However, any conventional underreamer may alternatively be utilized with one embodiment of the present invention provided in the position of stabilizer **150** in the drilling assembly **100**. Further, one embodiment of the present invention may be utilized in the position of underreamer **120**, and a conventional stabilizer may be utilized in the position of stabilizer **150**.

Referring now to FIG. **2**, where like numerals represent like components, a drilling assembly **200** is shown disposed within formation **10**, below any cased sections of the well. The drilling assembly **200** is drilling a borehole **20** utilizing a conventional drill bit **110** followed by a winged reamer **220**. The winged reamer **220** may be separated from the drill bit **110** by one or more drill collars **130**, but preferably the winged reamer **220** is connected directly above the drill bit **110**. Upstream of the winged reamer **220**, separated by one or more drill collars **130**, is a stabilizer **150** that controls the directional tendencies of the drilling assembly **200** in the underreamed borehole **25**. The drill bit **110** is shown at the bottom of the formation **10** drilling a borehole **20**, while the wing component **225** of the winged reamer **220** is simultaneously opening a larger diameter borehole **25** above. In the preferred assembly **200**, a preferred embodiment of the present invention would be located in the position of stabilizer **150**. In a most preferred assembly **200**, the stabilizer **150** would also include cutting structures to ensure that the larger borehole **25** is enlarged to the proper diameter.

Referring to FIG. **3**, where like numerals represent like components, again a drilling assembly **300** is shown disposed within formation **10**, below any cased sections of the well. The drilling assembly **300** utilizes a bi-center bit **320** that includes a pilot bit **310** and an eccentric underreamer bit **325**. As the pilot bit **310** drills the borehole **20**, the eccentric underreamer bit **325** opens a larger diameter borehole **25** above. The bi-center bit **320** is separated by one or more drill collars **130** from a stabilizer **150** designed to control the directional tendencies of the bi-center bit **320** in the underreamed borehole **25**. Again, the function of the stabilizer **150** is to offset the fulcrum or pivot effect created by the eccentric underreamer bit **325** to ensure that the pilot bit **310** stays centered as it drills the borehole **20**. In the preferred embodiment of the drilling assembly **300**, one embodiment of the expandable tool of the present invention would be located in the position of stabilizer **150**. In a most preferred assembly **300**, the stabilizer **150** would also include cutting structures to ensure that the larger borehole **25** is enlarged to the proper diameter.

Referring now to FIGS. **4** and **5**, one embodiment of the expandable tool of the present invention, generally designated as **500**, is shown in a collapsed position in FIG. **4** and in an expanded position in FIG. **5**. The expandable tool **500** comprises a generally cylindrical tool body **510** with a

8

flowbore **508** extending therethrough. The tool body **510** includes upper **514** and lower **512** connection portions for connecting the tool **500** into a drilling assembly. In approximately the axial center of the tool body **510**, one or more pocket recesses **516** are formed in the body **510** and spaced apart azimuthally around the circumference of the body **510**. The one or more recesses **516** accommodate the axial movement of several components of the tool **500** that move up or down within the pocket recesses **516**, including one or more moveable, non-pivotable tool arms **520**. Each recess **516** stores one moveable arm **520** in the collapsed position. The preferred embodiment of the expandable tool includes three moveable arms **520** disposed within three pocket recesses **516**. In the discussion that follows, the one or more recesses **516** and the one or more arms **520** may be referred to in the plural form, i.e. recesses **516** and arms **520**. Nevertheless, it should be appreciated that the scope of the present invention also comprises one recess **516** and one arm **520**.

The recesses **516** further include angled channels **518** that provide a drive mechanism for the moveable tool arms **520** to move axially upwardly and radially outwardly into the expanded position of FIG. **5**. A biasing spring **540** is preferably including to bias the arms **520** to the collapsed position of FIG. **4**. The biasing spring **540** is disposed within a spring cavity **545** and covered by a spring retainer **550**. Retainer **550** is locked in position by an upper cap **555**. A stop ring **544** is provided at the lower end of spring **540** to keep the spring **540** in position.

Below the moveable arms **520**, a drive ring **570** is provided that includes one or more nozzles **575**. An actuating piston **530** that forms a piston cavity **535**, engages the drive ring **570**. A drive ring block **572** connects the piston **530** to the drive ring **570** via bolt **574**. The piston **530** is adapted to move axially in the pocket recesses **516**. A lower cap **580** provides a lower stop for the axial movement of the piston **530**. An inner mandrel **560** is the innermost component within the tool **500**, and it slidingly engages a lower retainer **590** at **592**. The lower retainer **590** includes ports **595** that allow drilling fluid to flow from the flowbore **508** into the piston chamber **535** to actuate the piston **530**.

A threaded connection is provided at **556** between the upper cap **555** and the inner mandrel **560** and at **558** between the upper cap **555** and body **510**. The upper cap **555** sealingly engages the body **510** at **505**, and sealingly engages the inner mandrel **560** at **562** and **564**. A wrench slot **554** is provided between the upper cap **555** and the spring retainer **550**, which provides room for a wrench to be inserted to adjust the position of the spring retainer **550** in the body **510**. Spring retainer **550** connects at **551** via threads to the body **510**. Towards the lower end of the spring retainer **550**, a bore **552** is provided through which a bar can be placed to prevent rotation of the spring retainer **550** during assembly. For safety purposes, a spring cover **542** is bolted at **546** to the stop ring **544**. The spring cover **542** prevents personnel from incurring injury during assembly and testing of the tool **500**.

The moveable arms **520** include pads **522**, **524**, and **526** with structures **700**, **800** that engage the borehole when the arms **520** are expanded outwardly to the expanded position of the tool **500** shown in FIG. **5**. Below the arms **520**, the piston **530** sealingly engages the inner mandrel **560** at **566**, and sealingly engages the body **510** at **534**. The lower cap **580** is threadingly connected to the body and to the lower retainer **590** at **582**, **584**, respectively. A sealing engagement is also provided at **586** between the lower cap **580** and the body **510**. The lower cap **580** provides a stop for the piston **530** to control the collapsed diameter of the tool **500**.

9

Several components are provided for assembly rather than for functional purposes. For example, the drive ring **570** is coupled to the piston **530**, and then the drive ring block **572** is boltingly connected at **574** to prevent the drive ring **570** and the piston **530** from translating axially relative to one another. The drive ring block **572**, therefore, provides a locking connection between the drive ring **570** and the piston **530**.

FIG. 5 depicts the tool **500** with the moveable arms **520** in the maximum expanded position, extending radially outwardly from the body **510**. Once the tool **500** is in the borehole, it is only expandable to one position. Therefore, the tool **500** has two operational positions—namely a collapsed position as shown in FIG. 4 or an expanded position as shown in FIG. 5. However, the spring retainer **550**, which is a threaded sleeve, can be adjusted at the surface to limit the full diameter expansion of arms **520**. The spring retainer **550** compresses the biasing spring **540** when the tool **500** is collapsed, and the position of the spring retainer **550** determines the amount of expansion of the arms **520**. The spring retainer **550** is adjusted by a wrench in the wrench slot **554** that rotates the spring retainer **550** axially downwardly or upwardly with respect to the body **510** at threads **551**. The upper cap **555** is also a threaded component that locks the spring retainer **550** once it has been positioned. Accordingly, one advantage of the present tool is the ability to adjust at the surface the expanded diameter of the tool **500**. Unlike conventional underreamer tools, this adjustment can be made without replacing any components of the tool **500**.

In the expanded position shown in FIG. 5, the arms **520** will either underream the borehole or stabilize the drilling assembly, depending upon how the pads **522**, **524** and **526** are configured. In the configuration of FIG. 5, cutting structures **700** on pads **526** would underream the borehole. Wear buttons **800** on pads **522** and **524** would provide gauge protection as the underreaming progresses. Hydraulic force causes the arms **520** to expand outwardly to the position shown in FIG. 5 due to the differential pressure of the drilling fluid between the flowbore **508** and the annulus **22**.

The drilling fluid flows along path **605**, through ports **595** in the lower retainer **590**, along path **610** into the piston chamber **535**. The differential pressure between the fluid in the flowbore **508** and the fluid in the borehole annulus **22** surrounding tool **500** causes the piston **530** to move axially upwardly from the position shown in FIG. 4 to the position shown in FIG. 5. A small amount of flow can move through the piston chamber **535** and through nozzles **575** to the annulus **22** as the tool **500** starts to expand. As the piston **530** moves axially upwardly in pocket recesses **516**, the piston **530** engages the drive ring **570**, thereby causing the drive ring **570** to move axially upwardly against the moveable arms **520**. The arms **520** will move axially upwardly in pocket recesses **516** and also radially outwardly as the arms **520** travel in channels **518** disposed in the body **510**. In the expanded position, the flow continues along paths **605**, **610** and out into the annulus **22** through nozzles **575**. Because the nozzles **575** are part of the drive ring **570**, they move axially with the arms **520**. Accordingly, these nozzles **575** are optimally positioned to continuously provide cleaning and cooling to the cutting structures **700** disposed on pad surface **526** as fluid exits to the annulus **22** along flow path **620**.

The underreamer tool **500** of the one embodiment of the present invention solves the problems experienced with bi-center bits and winged reamers because it is designed to remain concentrically disposed within the borehole. In particular, the tool **500** of the present invention preferably includes three extendable arms **520** spaced apart circumfer-

10

entially at the same axial location on the tool **510**. In the preferred embodiment, the circumferential spacing would be 120° apart. This three arm design provides a full gauge underreaming tool **500** that remains centralized in the borehole at all times.

Another feature of the preferred embodiments of the present invention is the ability of the tool **500** to provide hydraulic indication at the surface, thereby informing the operator whether the tool is in the contracted position shown in FIG. 4, or the expanded position shown in FIG. 5. Namely, in the contracted position, the flow area within piston chamber **535** is smaller than the flow area within piston chamber **535** when the tool **500** is in the expanded position shown in FIG. 5. Therefore, in the expanded position, the flow area in chamber **535** is larger, providing a greater flow area between the flowbore **508** and the wellbore annulus **22**. In response, pressure at the surface will decrease as compared to the pressure at the surface when the tool **500** is contracted. This decrease in pressure indicates that the tool **500** is expanded.

FIGS. 6–10 provide more detail regarding the moveable arms **520** and drive ring **570** of FIGS. 4 and 5. FIG. 6 shows a "blank" arm **520** with no cutting structures or stabilizing structures attached to pads **522**, **524**, **526**. The arm **520** is shown in isometric view to depict a top surface **521**, a bottom surface **527**, a front surface **665**, a back surface **660**, and a side surface **528**. The top surface **521** and the bottom surface **527** are preferably angled, as described in more detail below. The arm **520** preferably includes two upper pads **522**, one middle pad **524**, and two lower pads **526** disposed on the front surface **665** of the arm **520**. The arm **520** also includes extensions **650** disposed along each side **528** of arm **520**. The extensions **650** preferably extend upwardly at an angle from the bottom **527** of the arm **520** towards pads **522**, **524** and **526**. The extensions **650** protrude outwardly from the arm **520** to fit within corresponding channels **518** in the pocket recess **516** of the tool body **510**, as shown in FIGS. 4 and 5. The interconnection between the arm extensions **650** and the body channels **518** increases the surface area of contact between the moveable arms **520** and the tool body **510**, thereby providing a more robust expandable tool **500** as compared to prior art tools. The arm **520** depicted in FIG. 6 is a blank version of either an underreamer cutting arm or a stabilizer arm. By changing the structures disposed on pads **522**, **524** and **526**, the tool **500** is converted from an underreamer to a stabilizer or vice versa, or to a combination underreamer/stabilizer.

Referring now to FIGS. 7, 8 and 9, an exemplary arm **520** is shown that includes two sets of cutting structures **700**, **710**. FIG. 7 depicts the arm **520** from a top perspective, FIG. 8 provides an elevational side view, and FIG. 9 shows an isometric perspective. The top surface **521** and the bottom surface **527** of the arm **520** are preferably angled in the same direction as best shown in FIG. 7. These surfaces **521**, **527** are designed to prevent the arm **520** from vibrating when pads **522**, **524** and **526** engage the borehole. Namely, when pads **522**, **524** and **526** engage the borehole, the arms **520** are held in compression by the piston **530**. The angled top surface **521** and the angled bottom surface **527** bias the arms **520** to the trailing side of the pocket recesses **516** to minimize vibration.

In the top view of FIG. 7, pads **522** comprise cutting structures **710** such that the arm **520** provides back reaming capabilities. Back reaming is pulling the tool **500** upwardly in the borehole while underreaming. Pad **524** is preferably covered with wear buttons **800** that provide a stabilizing and gauge protection function. Pads **526** comprise cutting struc-

US 6,732,817 B2

11                                                          12

tures **700** for underreaming. In the side view of FIG. **8**, the extensions **650** that fit within channels **518** of the body **510** are shown extending upwardly at an angle along the side **528** from the back surface **660** of the arm **520** towards pads **522**, **524** and **526**. FIG. **9** shows the same arm **520** in isometric view.

To change the arm **520** shown in FIGS. **7**, **8**, and **9** from a back reaming and underreaming arm to simply an underreaming arm, the back reaming cutting structures **710** would be replaced with wear buttons, such as buttons **800**. This configuration would result in the underreaming arm **520** shown in FIGS. **4** and **5**. Modifying the tool **500** from an underreamer to a stabilizer simply requires providing stabilizing structures on all of the pads **522**, **524** and **526**. As a stabilizer, surfaces **522**, **524**, and **526** would be covered with a dense plurality of wear buttons **800** without any cutting structures. The preferred material for the wear buttons **800** is a tungsten carbide or diamond material, which provides good wear capabilities. In an alternative embodiment, the pads **522**, **524**, and **526** may be coated with a hardened material called TCI 300H hardfacing.

Accordingly, the pads **522**, **524**, **526** could comprise a variety of structures and configurations utilizing a variety of different materials. When the tool is used in an underreaming function, a variety of different cutting structures **700** could be provided on surfaces **526**, depending upon the formation characteristics. Preferably, the cutting structures **700**, **710** for underreaming and back reaming, respectively, are specially designed for the particular cutting function. More preferably, the cutting structures **700**, **710** comprise the cutting structures disclosed and claimed in co-pending U.S. patent application Ser. No. 09/924,961, filed Aug. 8, 2001, entitled "Advanced Expandable Reaming Tool," assigned to Smith International, Inc., which is hereby incorporated herein by reference.

Referring now to FIG. **10**, additional advantages of the preferred embodiments of the present invention are provided by the one or more nozzles **575** disposed in the drive ring **570**. The underreamer/stabilizer of the preferred embodiments of the present invention preferably includes three moveable arms **520** spaced apart circumferentially at the same axial location along the tool body **510**. In the preferred embodiment, the three moveable arms **520** are spaced 120° circumferentially. This arrangement of the arms **520** is preferred to centralize the tool **500** in the borehole. The drive ring **570** is moveable with the arms **520** and preferably includes three extended portions **576** spaced 120° circumferentially with angled nozzles **575** therethrough that are designed to direct drilling fluid to the cutting structures **700** of the underreamer at surfaces **526**. The boreholes **578** in the extended portions **576** adjacent nozzles **575** accept bolts **574** to connect the drive ring **570** to the drive ring block **572** and piston **530**. An aperture **571** is disposed through the center of the drive ring **570** to enable a connection to the piston **530**. Because the drive ring **570** is connected to the piston **530**, it moves with the piston **530** to push the moveable arms **520** axially upwardly and outwardly along the channels **518** to the expanded position. Accordingly, because drive ring **570** moves with the arms **520**, the nozzles **575** continuously provide drilling fluid to the cutting structures **700** on the underreamer surfaces **526**. The nozzles **575** are optimally placed to move with and follow the cutting structures **700** and thereby assure that the cutters **700** are properly cleaned and cooled at all times.

FIGS. **11** and **12** depict a second embodiment of the present invention, generally designated as **900**, in the collapsed and expanded positions, respectively. Many compo-

nents of tool **900** are the same as the components of embodiment **500**, and those components maintain the same reference numerals. There are, however, several differences. The inner mandrel **560** of the first embodiment tool **500** is replaced by a stinger assembly **910**, preferably comprising an upper inner mandrel **912**, a middle inner mandrel **914**, and a lower inner mandrel **916**. The lower inner mandrel **916** includes ports **920** that must align with ports **595** in the lower retainer **590** before fluid can enter piston chamber **535** to actuate the piston **530**. As shown in FIG. **11**, fluid flows through the flowbore **508** of tool **900**, along pathway **605** depicted by the arrows. Because the ports **920** of the lower inner mandrel **916** do not align with the ports **595** of the lower retainer **590**, the fluid continues flowing along path **605**, past ports **595**, down through the tool **900**.

The tool **900** is selectively actuated utilizing an actuator (not shown), which aligns the ports **920** with the ports **595** to enable the expandable tool to move from the contracted position shown in FIG. **11** to the expanded position shown in FIG. **12**. Below lower inner mandrel **916**, a bottom spring **930** is disposed within a bottom spring chamber **935** and held within the body **510** by a bottom spring retainer **950**. Bottom spring retainer **950** threadingly connects at **952** to the lower retainer **590**. The spring **930** biases the stinger assembly **910** upwardly such that stinger **910** must be forced downwardly by an actuator to overcome the force of bottom spring **930**. By moving the stinger **910** downwardly, the ports **920** disposed circumferentially around the bottom of lower inner mandrel **916** align with the ports **595** of lower retainer **590** that lead into piston chamber **535**.

FIG. **12** shows the tool **900** in an expanded position. In this position, drilling fluid flows through the flowbore **508**, along pathway **605**. However, because stinger **910** has been actuated downwardly against the force of bottom spring **930** by an actuator, the ports **920** in lower inner mandrel **916** now align with ports **595** in the lower retainer **590**. Therefore, when the drilling fluid proceeds downwardly along flow path **605** through the flowbore **508** to reach ports **920**, it will flow through ports **920**, **595** and into the piston chamber **535** as depicted by flow arrows **610**.

Due to the differential pressure between the flowbore **508** and the wellbore annulus **22** surrounding tool **900**, the fluid flowing along pathway **610** will actuate the piston **530** upwardly against the force of spring **540**. The piston **530** will push the drive ring **570**, which will push the arms **520** axially upwardly and outwardly as the extensions **650** on the arms **520** move along channels **518** in the body **510**. Once the fluid flows through the nozzles **575** in the drive ring **570**, it exits at an angle along pathway **620** to cool and clean the cutting structures **700** disposed on surfaces **526** that underream the borehole. Accordingly, the second embodiment **900** of FIGS. **11** and **12** is capable of being selectively actuated. Namely, by engaging the upper surface **975** of stinger **910** with an actuator, the tool **900** can be selectively actuated at the election of the operator to align the ports **920** and **595**. The preferred actuator is the flow switch described and claimed in U.S. Pat. No. 6,289,999 entitled "Fluid Flow Control Devices and Methods for Selective Actuation of Valves and Hydraulic Drilling Tools," hereby incorporated herein by reference.

Referring again to FIGS. **11** and **12**, typically a gap is provided between the upper end **975** of the stinger **910** and the actuator when the tool is in the collapsed position. That gap length must be maintained to ensure that actuation occurs only when it is meant to occur. Accordingly, upper inner mandrel **912** may include an adjustment ring portion **918**, which is just a spacer ring that makes up any discrep-

13

14

ancies in the area between the upper inner mandrel **912** and the middle inner mandrel **914** such that the appropriate gap dimension can be maintained.

As one of ordinary skill in the art will readily appreciate, any actuating mechanism can be utilized to selectively actuate the tool **900** of FIGS. **11** and **12**. However, the preferred flow switch provides the advantage of additional hydraulic indications to the surface, in addition to the pressure indications provided by the increased flow area in the piston chamber **535** when the tool **900** is in the expanded position of FIG. **12**. Namely, the preferred flow switch includes an uplink pulser capable of providing position and status information to the surface via mud pulse telemetry. Accordingly, the preferred embodiment comprises the tool **900** of FIGS. **11** and **12**, and more preferably comprises the tool **900** in combination with the referenced flow switch.

In operation, an expandable tool **500** or **900** is lowered through casing in the collapsed position shown in FIGS. **4** and **11**, respectively. The first embodiment of the tool **500** would then be expanded automatically when drilling fluid flows through flowbore **508**, and the second embodiment of the tool **900** would be expanded only after selectively actuating the tool **900**. Whether the selective actuation feature is present or not, the tools **500**, **900** expand due to differential pressure between the flow bore **508** and the wellbore annulus **22** acting on the piston **530**. That differential pressure may be in the range of 800 to 1,500 psi. Therefore, differential pressure working across the piston **530** will cause the one or more arms **520** of the tool to move from a collapsed to an expanded position against the force of the biasing spring **540**.

Before the drilling assembly is lowered into the borehole, the function of the present invention as either an underreamer or as a stabilizer would be determined. Referring again to FIG. **1**, one example would be to use either embodiment of the tool **500**, **900** in the position of underreamer **120**, and preferably to use the second embodiment of the tool **900** in the position of stabilizer **150**. As another example, referring to FIGS. **2** and **3**, if a winged reamer **220** or a bi-center bit **320** is used instead of an underreamer **120**, the second embodiment of the tool **900** would preferably be used in the position of stabilizer **150**. As an underreamer, the preferred embodiments of the present invention are capable of underreaming a borehole to a desired diameter. As a stabilizer, the preferred embodiments of the present invention provide directional control for the assembly **100**, **200**, **300** within the underreamed borehole **25**.

In summary, the various embodiments of the expandable tool of the present invention may be used as an underreamer to enlarge a borehole below a restriction to a larger diameter. Alternatively, the various embodiments of the expandable tool may be used to stabilize a drilling system in a previously underreamed borehole, or in a borehole that is being underreamed while drilling progresses. The various embodiments of the present invention solve the problems of the prior art and include other features and advantages. Namely, the embodiments of the present expandable tool are stronger and have a higher hydraulic capacity than prior art underreamers. The preferred embodiments of the tool also provide pressure indications at the surface regarding whether the tool is collapsed or expanded. The tool preferably includes a novel assembly for moving the arms to the expanded position. Yet another advantage of the preferred embodiments is that the tool can be used in conjunction with other conventional devices such as a winged reamer or a bi-center bit to ensure that they function properly. The preferred embodiments of the tool further include one or more optimally placed and

moveable nozzles for cleaning and cooling the cutting structures. Finally, the preferred embodiments of the present invention allow for adjustable expanded diameters without component changes.

While preferred embodiments of this invention have been shown and described, modifications thereof can be made by one skilled in the art without departing from the spirit or teaching of this invention. The embodiments described herein are exemplary only and are not limiting. Many variations and modifications of the system and apparatus are possible and are within the scope of the invention. Accordingly, the scope of protection is not limited to the embodiments described herein, but is only limited by the claims which follow, the scope of which shall include all equivalents of the subject matter of the claims.

What is claimed is:

**1**. An expandable downhole tool for use in a drilling assembly positioned within a wellbore, comprising:

a tubular body including at least one axial recess, a plurality of angled channels formed into a wall of said at least one axial recess, and an axial flowbore extending therethrough; and

at least one moveable arm;

wherein said at least one moveable arm translates along said plurality of angled channels between a collapsed position and an expanded position in response to a differential pressure between said axial flowbore and said wellbore.

**2**. The tool of claim **1** further including means for adjusting said expanded position.

**3**. The tool of claim **1** further including at least one nozzle that translates with said at least one moveable arm.

**4**. The tool of claim **1** further including a spring to bias said at least one moveable arm to said collapsed position.

**5**. The tool of claim **1** wherein said at least one axial recess stores said at least one moveable arm in said collapsed position.

**6**. The tool of claim **1** wherein said at least one moveable arm includes a plurality of extensions corresponding to and engaging said plurality of channels.

**7**. The tool of claim **1** wherein said at least one moveable arm comprises three moveable arms spaced apart circumferentially around said tool body.

**8**. The tool of claim **1** wherein said at least one moveable arm includes angled surfaces for connecting into said body.

**9**. The tool of claim **1** further including a piston that translates said at least one moveable arm axially upwardly from said collapsed position to said expanded position.

**10**. The tool of claim **1** wherein said at least one moveable arm engages said wellbore in said expanded position.

**11**. The tool of claim **10** wherein said at least one moveable arm includes at least one set of cutting structures for underreaming said wellbore in said expanded position.

**12**. The tool of claim **10** wherein said at least one moveable arm includes at least one wear structure for stabilizing said drilling assembly within said wellbore.

**13**. The tool of claim **1** further including a chamber in fluid communication with said flowbore and said wellbore.

**14**. The tool of claim **13** wherein said chamber enlarges as said at least one moveable arm translates from said collapsed position to said expanded position.

**15**. The tool of claim **13** further including an inner member with ports therethrough that enable fluid communication between said chamber and said flowbore.

**16**. The tool of claim **15** further including means for selectively opening and closing said ports.

**17**. The tool of claim **15** further including a stinger biased to close said ports, thereby preventing said at least one

US 6,732,817 B2

15

moveable arm from translating between said collapsed position and said expanded position in response to said differential pressure.

**18**. The tool of claim **17** further including an actuator for aligning said stinger to open said ports.

**19**. The tool of claim **1** further including a chamber in fluid communication with said flowbore.

**20**. The tool of claim **19** further including an inner member with ports therethrough that enable fluid communication between said chamber and said flowbore.

**21**. The tool of claim **20** further including means for selectively opening said ports.

**22**. The tool of claim **1** wherein said at least one moveable arm comprises at least one borehole engaging pad adapted to accommodate cutting structures or wear structures or a combination thereof.

**23**. The tool of claim **22** wherein said at least one borehole engaging pad comprises two upper pads, a middle pad, and two lower pads.

**24**. The tool of claim **22** wherein said at least one borehole engaging pad provides back reaming capability.

**25**. The tool of claim **22** wherein said at least one borehole engaging pad provides gauge protection capability.

**26**. The tool of claim **22** wherein said at least one borehole engaging pad provides underreaming capability.

**27**. The tool of claim **22** wherein said at least one borehole engaging pad provides stabilizing capability.

**28**. An expandable downhole tool for use in a drilling assembly positioned within a wellbore having an original diameter borehole and an enlarged diameter borehole, comprising:

a body; and

at least one non-pivotable, moveable arm having at least one borehole engaging pad adapted to accommodate cutting structures or wear structures or a combination thereof;

wherein said at least one arm is moveable between a first position defining a collapsed diameter, and a second position defining an expanded diameter approximately equal to said enlarged diameter borehole.

**29**. The tool of claim **28** wherein said at least one arm underreams said original diameter borehole to produce said enlarged diameter borehole.

**30**. The tool of claim **28** wherein said at least one arm stabilizes said drilling assembly within said enlarged diameter borehole.

**31**. The tool of claim **28** wherein said at least one arm is moveable between said first position and said second position in response to a differential fluid pressure.

**32**. The tool of claim **31** wherein said at least one arm is automatically moveable from said first position to said second position whenever said differential pressure is present.

**33**. The tool of claim **31** wherein said tool is selectively actuatable to enable said at least one arm to be moveable from said first position to said second position whenever said differential pressure is present.

**34**. The tool of claim **28** wherein said at least one non-pivotable, moveable arm further comprises a plurality of extensions that fit within a plurality of channels in said body.

**35**. The tool of claim **34** wherein said extensions and said channels comprise a drive mechanism for moving said at least one arm between said first position and said second position.

**36**. The tool of claim **34** wherein said extensions and said channels support loading on said at least one arm in said second position.

16

**37**. The tool of claim **28** wherein said at least one non-pivotable, moveable arm further comprises angled surfaces that engage said body to prevent said arm from vibrating in said second position.

**38**. The tool of claim **28** wherein said at least one borehole engaging pad comprises two upper pads, a middle pad, and two lower pads.

**39**. The tool of claim **28** wherein said at least one borehole engaging pad provides back reaming capability.

**40**. The tool of claim **28** wherein said at least one borehole engaging pad provides stabilizing capability.

**41**. The tool of claim **28** wherein said at least one borehole engaging pad provides gauge protection capability.

**42**. The tool of claim **28** wherein said at least one borehole engaging pad provides underreaming capability.

**43**. A method of underreaming a wellbore to form an enlarged borehole and controlling the directional tendencies of a drilling assembly within the enlarged borehole, comprising:

using a drill bit to drill the wellbore;

disposing a first expandable tool having at least one arm configured for underreaming directly above the drill bit;

using the first expandable tool to form the enlarged borehole;

disposing a second expandable tool having at least one arm configured for stabilizing above the first expandable tool; and

using the second expandable tool to control the directional tendencies of the drilling assembly within the enlarged borehole;

wherein both the first expandable tool and the second expandable tool operate between a collapsed position and an expanded position.

**44**. The method of claim **43** further including providing an indication at the surface corresponding to the position of the first expandable tool and the position of the second expandable tool.

**45**. The method of claim **43** wherein the first expandable tool and the second expandable tool have the same design except for the configuration of the respective arms.

**46**. The method of claim **45** wherein both the first expandable tool and the second expandable tool automatically translate between the collapsed position and the expanded position in response to a differential pressure.

**47**. The method of claim **45** wherein the first expandable tool must be selectively aligned and the second expandable tool must be selectively aligned to enable translation between the collapsed position and the expanded position in response to a differential pressure.

**48**. The method of claim **43** wherein the first expandable tool automatically translates between the collapsed position and the expanded position and the second expandable tool must be selectively aligned to enable translation between the collapsed position and the expanded position.

**49**. The method of claim **43** further including providing an indication at the surface corresponding to the position of either the first expandable tool or the second expandable tool.

**50**. The method of claim **43** wherein the first expandable tool and the second expandable tool have the same design including the configuration of the respective arms.

**51**. An expandable downhole tool for use in a drilling assembly, comprising:

a body including a plurality of angled channels;

at least one non-pivotable, moveable arm that translates along said angled channels between a collapsed position and an expanded position; and

US 6,732,817 B2

17

at least one moveable nozzle that translates to remain adjacent said at least one moveable arm so as to direct fluid across a borehole-engaging surface of said at least one moveable arm.

52. The tool of claim 51 further including means for adjusting said expanded position.

53. The tool of claim 51 further including a plurality of extensions that engage said angled channels.

54. The tool of claim 51 further including means to prevent the translation of said at least one moveable arm between said collapsed position and said expanded position.

55. A drilling assembly for underreaming a wellbore to form an enlarged borehole, comprising:

a drill bit to drill the wellbore;

a first expandable tool having at least one moveable arm configured for underreaming, said first expandable tool being positioned directly above the drill bit; and

a second expandable tool having the same design as said first expandable tool, said second expandable tool being positioned above the first expandable tool;

wherein said first expandable tool may be used to form said enlarged borehole or to control the directional tendencies of said drilling assembly.

56. The drilling assembly of claim 55 wherein said second expandable tool may be used to form said enlarged borehole or to control the directional tendencies of said drilling assembly.

57. The drilling assembly of claim 55 wherein each of said first expandable tool and said second expandable tool operate between a collapsed position and an expanded position.

58. The drilling assembly of claim 57 wherein each of said first expandable tool and said second expandable tool is adapted to provide an indication at the surface corresponding to its position.

59. The drilling assembly of claim 57 wherein said first expandable tool must be selectively aligned and said second expandable tool must be selectively aligned to enable translation between said collapsed position and said expanded position in response to a differential pressure.

60. The drilling assembly of claim 57 wherein said first expandable tool automatically translates between said collapsed position and said expanded position and the second expandable tool must be selectively aligned to enable translation between said collapsed position and said expanded position in response to a differential pressure.

61. The drilling assembly of claim 57 wherein said first expandable tool must be selectively aligned to enable translation between said collapsed position and said expanded position and said second expandable tool automatically translates between said collapsed position and said expanded position in response to a differential pressure.

18

62. The drilling assembly of claim 55 wherein each of said expandable tools comprises:

a tubular body including a plurality of angled channels and an axial flowbore extending therethrough; and

at least one moveable arm;

wherein said at least one moveable arm translates along said plurality of angled channels between a collapsed position and an expanded position in response to a differential pressure.

63. The drilling assembly of claim 62 wherein each of said expandable tools further comprises at least one nozzle that translates with said at least one moveable arm to direct fluid across a borehole engaging pad.

64. The drilling assembly of claim 62 wherein said at least one moveable arm includes a plurality of angled extensions that slideably interfit between said plurality of angled channels.

65. The drilling assembly of claim 64 wherein plurality of angled extensions extend substantially along the length of said at least one moveable arm.

66. The drilling assembly of claim 64 wherein said channels and extensions provide support to said at least one moveable arm in said expanded position.

67. The drilling assembly of claim 62 wherein each of said expandable tools further comprises a chamber in fluid communication with said flowbore.

68. The drilling assembly of claim 67 wherein each of said expandable tools further comprises an inner member with ports therethrough that enable fluid communication between said chamber and said flowbore.

69. The drilling assembly of claim 68 wherein each of said expandable tools further comprises means for selectively opening said ports.

70. The drilling assembly of claim 68 wherein each of said expandable tools further comprises a stinger biased to close said ports, thereby preventing said at least one moveable arm from translating between said collapsed position and said expanded position in response to said differential pressure.

71. The drilling assembly of claim 70 wherein each of said expandable tools further comprises an actuator for aligning said stinger to open said ports.

72. The drilling assembly of claim 62 wherein said at least one moveable arm comprises at least one borehole engaging pad adapted to accommodate cutting structures or wear structures or a combination thereof.

73. The drilling assembly of claim 72 wherein said at least one borehole engaging pad comprises two upper pads, a middle pad, and two lower pads.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing CORRECTED BRIEF FOR SMITH INTERNATIONAL, INC. was filed with the Clerk of the United States Court of Appeals for the Federal Circuit on October 24, 2016, using the Court's CM/ECF system, which will send a notice to counsel for Appellee, Nathan K. Kelley, Solicitor, United States Patent and Trademark Office, Office of the Solicitor, P.O. Box 1450, Mail Stop 8, Alexandria, VA 22313.  I also certify that I served a copy of the foregoing on counsel for Appellee by electronic mail, at nathan.kelley@uspto.gov.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for timely delivery to the Clerk, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C. 20439.

Dated:  October 24, 2016

/s/ John R. Keville
John R. Keville
WINSTON & STRAWN LLP
1111 Louisiana Street, 25th Floor
Houston, TX  77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700
Email: jkeville@winston.com

*Attorneys for Smith International, Inc.*